In the Matter of the Estate of WILLIAM E. BENJAMIN, Deceased.

Surrogate's Court, New York County, May 15, 1941.

*Jackson, Fuller, Nash & Brophy* [*John G. Jackson* and *George B. Brooks* of counsel], for the executors.

*Edward G. Griffin* [*Bernard A. Culloton* and *Jerome M. Hirsch* of counsel], special counsel for the New York State Tax Commission.

*Francis A. Pallotti, Attorney-General of the State of Connecticut,* by *T. Ludlow Chrystie, Special Assistant Attorney-General* [*Charles J. McLaughlin*, Commissioner of Taxation, *Frederic W. Dauch*, Deputy Commissioner, and *Thomas Witter Chrystie* of counsel], for the State of Connecticut.

*William K. Laughlin*, special guardian.

FOLEY, S. This proceeding was initiated upon the petition of the executors for the purpose of obtaining a determination as to whether the residence of the decedent at the time of his death was

in the State of New York or in the State of Connecticut. In their petition the executors stated that a claim had been asserted by Connecticut that Mr. Benjamin died a resident of the town of Greenwich in that State and that Connecticut was willing to litigate the question of residence in this court. The executors further stated that they were advised and believed that it would be to the best interests of the estate, and of the persons interested that the question of residence " be litigated before a Surrogate of the County of New York in order that a single decree binding upon the States of New York and Connecticut may be entered herein." The Surrogate's Court of this county was requested to " accept jurisdiction of this proceeding and take evidence   *   *   *   and determine " said residence with due regard to the claims of the contending parties that the decedent died either a resident of Connecticut or of New York. Citation was issued and served upon all such persons interested. Thereupon, an order was made by the surrogate directing that Connecticut be permitted to intervene in the proceeding to the end that the question of residence at the time of death be determined and that " the State of Connecticut be permitted to litigate that question as a proper party in this proceeding." Connecticut by a formal notice of appearance, evidenced by the certificates of its Governor, its Secretary of State and its Attorney-General, intervened and appeared " as a proper party in this proceeding, to the end that the question of whether the decedent at the time of his death was a resident of the State of Connecticut or a resident of the State of New York " be determined in this proceeding. Such appearance was made by a Special Assistant Attorney-General under the authorizations of the officials of that State. The order of intervention was made upon the express consent of the duly authorized representatives of the State Tax Commission of New York.

The procedure thus adopted by the parties was approved by our Court of Appeals in *Matter of Trowbridge* (266 N. Y. 283). It is a highly commendable solution of the problem of the determination of the disputed domicile of a decedent as between two contending States since by a single adjudication it will avoid any possibility of the burdensome imposition of duplicate estate taxes.

The beneficial result of submission to one tribunal, by consent of both States, is easily demonstrated by the size of the estate here involved and the taxes that might be imposed in the event that domicile was adjudicated in the respective jurisdictions to be in each of the contending States. (*Matter of Dorrance*, 309 Penn. St. 151; 163 A. 303; 115 N. J. Eq. 268; 170 A. 601; affd., 116 N. J. L. 362; 184 A. 743.) The gross estate of the testator

approximates $16,000,000. In the event that it is found that Mr. Benjamin died a legal resident of New York, the tax payable to that State will approximate $2,500,000. In case Connecticut succeeds, the tax payable to it will aggregate about $2,000,000.

Upon the trial of the issue numerous witnesses were called by the opposing parties. Very many exhibits, consisting principally of written declarations of the decedent, were received in evidence. Joined with Connecticut in asserting residence in that State were the executors and the special guardian of certain infant beneficiaries. The State Tax Commission of New York stood alone in its contention of domicile in that State. The issue was sharply contested. The necessity for consideration and analysis of the very many facts in evidence has perhaps unduly extended this decision beyond the usual and desirable limits.

In the process of arriving at a conclusion as to domicile, the surrogate has applied the rules of law laid down by the earlier outstanding authorities in our own State (*Dupuy* v. *Wurtz*, 53 N. Y. 556; *Matter of Newcomb*, 192 id. 238), and the more recent cases in the United States Supreme Court and in this State. (*Texas* v. *Florida*, 306 U. S. 398; *Matter of Trowbridge*, 266 N. Y. 283; *Matter of Johnson*, 259 App. Div. 290; affd., 284 N. Y. 733; *Matter of Packard*, 223 App. Div. 491; affd., 251 N. Y 543.)

Under these tests the surrogate holds upon the evidence that the decedent was domiciled at the time of his death in the county and State of New York.

William E. Benjamin was born in this county on February 19, 1859. He died there on February 24, 1940. It is undisputed that he was a legal resident of the State of New York until the month of December, 1936, when he was seventy-seven years of age. He was educated at Union College, located at Schenectady, in this State. His father had been a publisher of newspapers in New York city and spent most of his life, particularly in his later years, in New York. His mother came of a Long Island family. The decedent here was married in New York city in 1886. His wife was the daughter of Henry H. Rogers, who had accumulated a very large fortune through his activities in the original Standard Oil Company and as a builder of railroads. Mr. Benjamin, in the period from the time of his marriage in 1886 to the date of his death, spent the winters at successive private houses located in New York county and owned by him, or at hotels here, or at his apartments in this county.

In 1902 he purchased a country house at Ardsley-on-Hudson, Westchester county, N. Y., which he occupied in the spring and fall and in certain years during the summer, including 1936, his last

year of occupancy there. In the earlier years of his married life he spent certain of his summers at the house of his father-in-law at Fairhaven, Mass., and others at resorts in the Adirondack Mountains. On occasions he made trips to Europe.

Mrs. Benjamin died in 1924. In July of 1925 Mr. Benjamin acquired a lease of a co-operative and proprietary apartment located in the building No. 280 Park avenue, New York city. He purchased it for the sum of $80,000. The apartment was pretentious and in it he maintained to the time of his death a collection of paintings and objects of art of substantial value. There for the last fifteen years of his life he spent each winter. Mr. Benjamin lived there alone. His son and daughter and their children occupied their own respective homes. The decedent kept a staff of servants at the apartment in keeping with his wealth and h's accustomed standard of living.

His house and grounds at Ardsley were of substantial extent. The building contained elaborate furnishings although of lesser value than those in his apartment in New York city.

Upon his wife's death in 1924 he inherited from her a fortune of approximately $14,000,000. From that time on until his death, he devoted himself actively to the management of his large investments which had been transferred to a holding company known as the " Taykair Corporation." Mr. Benjamin died, as previously stated, on February 24, 1940, in New York county at the age of eighty-one years.

It is an undisputed fact that from the year 1917 to November 15, 1936, he regarded himself and was a lega resident of Ardsley-on-Hudson, Westchester county in this State. He declared himself uniformly to be a resident of that place in formal documents during this period and voted there at the general elections of 1926, 1928 and 1932.

We have heretofore dealt with a conceded period of legal residence in New York State covering seventy-seven years. Consideration must now be given to the disputed period covering the latter part of 1936, the years 1937 to 1939 and the few months of 1940, out of which arose the present controversy. The evidence in the case presents a question of peculiar difficulty which principally arises because in parts of this disputed period Mr. Benjamin occupied a dwelling in each of two States. In this sense and in many of the other phases of the case it closely resembles the facts in *Matter of Lydig* (191 App. Div. 117).

The turning point of the new period is December 17, 1936, but even prior to that date events occurred which led to the attempted change of residence from the State of New York. In the years 1934,

1935 and 1936 discussions took place between Mr. Benjamin, his son and his trusted employees with the objective of removing his residence from the State of New York in order to diminish his income and inheritance taxes. The choice first discussed was a transfer of his domicile to Florida or to New Jersey. These States, however, were given no special consideration by him In the latter part of this period the design to acquire a domicile in Connecticut was proposed. The decision of the Court of Appeals in *Matter of Trowbridge (supra)*, rendered by that court on February 26, 1935, became a matter of special study and a digest of it was prepared by one of his employees. In that case it was held that the decedent was a resident of Connecticut and not of New York. In these conferences, the principal, if not the only consideration, was the saving in taxes that could be effected by Mr. Benjamin in his lifetime and by his heirs after his death. A memorandum was prepared in 1936 by one of his employees showing the advantages of residence in the State of Connecticut as against New York from a tax standpoint which covered income taxes, sales taxes, unemployment taxes and inheritance taxes. The writer pointed out that the establishment of a home in Connecticut did not imply a constant residence there. In his opinion as a layman the writer also stated that so long as it was proved that Connecticut was the " official residence," and the person involved spent part of his time there, it was sufficient proof that he was not subject to any New York taxes regardless of how many houses he might have in New York State. His theory was that the mere filing of income tax returns in Connecticut was proof of residence there and he intimated that voting might also help.

From the very beginning of the plans of his advisers to remove his legal residence to another State there is indisputable evidence of Mr. Benjamin's strong resistance to such a change and his preference for the retention of his New York residence. Thus in a letter dated October 1, 1936, he wrote concerning his hostility towards the establishment of his residence in Connecticut. He mentioned the possible saving of income taxes by the change from New York to that State, but said: " I don't see, in order to save money for my heirs, why I should discommode myself for the coming final three or four years." This aversion towards the dictates of his advisers recurs not infrequently in his subsequent declarations and is indicative of the lack of finality of an intention ever to abandon New York as his domicile.

In the development of the design for change a New York attorney was retained to advise the decedent and his employees as to the steps to be taken to attain the objective. It should be said in justice to the present attorneys for the executors that they were not

connected in any manner with the scheme. A Connecticut attorney was also employed to advise as to the law of that State. In the light of the facts presented 'n the record, the task of these two attorneys was far from simple. The first inevitable step in their advice was that a Connecticut house be purchased. The second inevitable course was suggested to require the making of declarations in formal documents describing Mr. Benjamin as a resident of Connecticut, instead of New York, in contrast with his prior written declarations. The difficulty in the situation, however, was that the attorneys were dealing with a client who was suspicious of those about him, fearful of their desire to control his fortune and obstinate in the retention of his own habits of life and his desire to remain a resident of this State. The greatest difficulty of all, however, was that Mr. Benjamin was given to prolific letter writing. His multitudinous correspondence over the period from December 17, 1936, the alleged date of the acquisition of a Connecticut residence, down to the time of his death, demonstrates an extraordinary form of written garrulity which never altered a possible floating intention into a final establishment of a domicile outside of the State of New York.

This conflict of wills between Mr. Benjamin on one side, and his attorneys and employees on the other, furnishes the test of each of his successive acts and of his oral and written declarations, sometimes indicative of an attempt to change, at other times contradictory, but never finally decisive.

Pursuant to the plan of campaign of his then legal adviser, he purchased a house in Greenwich, Conn., in the latter part of 1936. He acquired title to it on December seventeenth of that year. It cost $50,000. It was not of modern construction, but suited his taste because of its location near Long Island Sound which accorded with his love of salt water and sailing. It is significant of the precipitous haste to move Mr Benjamin to Connecticut that the deed to this house described him as of the town of Greenwich, despite the fact that he did not occupy the house until the 30th of April, 1937, over four months later, and that he had no other place of abode in the State of Connecticut prior to the latter date. On December 18, 1936, the day after he acquired the property, he filed through his Connecticut attorney an application to be listed by the registrars of voters of Greenwich. His Greenwich address appears upon the document.

From November 16, 1936, to April 30, 1937, he continued to treat his apartment at 280 Park avenue in this county as his real home, living there in the same manner in which he had spent the prior ten years of his life. In his Federal income tax return for the

year 1936, which was verified on March 2, 1937, the Connecticut address was given, and in his New York State income tax return for that year, which was verified on April 14, 1937, there appears the statement (erroneous in fact) that he " moved to Greenwich, Conn. on Dec. 17, 1936." Upon the same day he wrote the New York State Tax Commission, calling attention to the notation on his return " to the effect that on December 17, 1936, I changed my residence to the State of Connecticut." He further stated, however, that he had paid his income tax for the full calendar year as a resident. The significance of these attempts to establish Mr. Benjamin's residence in Connecticut, as effective in December of 1936, lies in the fact that under no recognized theory of the law of domicile could such a contention be vindicated. " While one's statements may supply evidence of the intention requisite to establish domicile at a given place of residence, they cannot supply the fact of residence there." (Mr. Justice STONE in *Texas* v. *Florida*, 306 U. S. 398, 425, citing *Matter of Newcomb*, 192 N. Y. 238, 250, and *Matter of Trowbridge*, 266 id. 283.)

Indeed there is express recognition of the futility of the attempts made to locate his legal residence in Connecticut in December, 1936, for in a letter written on February 3, 1938, he spoke of going up to Greenwich " on the first of April to complete my year's residence by the first of May, when I become a citizen of Connecticut." Thus by his own later calculation his first occupation of his Connecticut house had not taken place until May 1, 1937.

All of his declarations as to residence in Connecticut made in formal documents prior to April thirtieth, when he spent his first night in the Greenwich house. were thus false in fact. They evidence an unjustified haste to locate Mr. Benjamin outside the New York taxing orbit and they not only cast doubt but destroy the substance of every formal pronouncement of a change of domicile which were so obviously dictated under the advice of counsel.

In the period between April 30, 1937, when he first lived in the Connecticut house, and August, 1937, there are even stronger written expressions in evidence which show uncontrovertibly his hostility and opposition to any decisive change of residence from one State to the other. Counsel have referred to this period as showing a floating intention or a period of indecision. On the other hand, Mr. Benjamin's written declarations·are forceful evidence that he never intended to leave nor ever actually left the anchorage in New York State of his domicile of origin and his legal residence for three-quarters of a century.

Witnesses have testified to oral statements that he had in mind a possible change of residence, with a tax viewpoint, and that

he was irked by the high income taxes levied by the State of New York. There were also expressions of fear on his part that the change might not be desirable because of the possibility of incurring greater taxes by the establishment of a Connecticut legal residence. In May, 1937, one of his employees prepared for him a statement showing a comparison of New York and Connecticut taxes based upon the year 1936. In this memorandum it was shown that there might be a net saving in income taxes of approximately $16,000 and in " addition, there would be a saving in Estate taxes of about $500,000 (after W E. B. death)." The initials are those of Mr. Benjamin

On June 25, 1937, he wrote to one of his office managers strongly emphasizing his indecision and the reason for it He stated that he noticed that his income tax bills came quarterly to Ardsley-on-Hudson and referred to that practice thus: " This may be the correct procedure for the current year *because the establishment of myself as a resident of Connecticut is still undetermined.*" (Italics mine.) In it also he expressed the fear that his lawyers in Connecticut were attempting to arrange his prospective personal tax at Hartford which might involve the imposition of additional taxes by that State of $12,000 instead of the originally estimated saving by a change of residence from New York of $18,000. He closed with the significant phrase, " Meantime I will work along with my Greenwich lawyers to determine whether to move back to New York and keep this residence as an outside investment." The reference to " residence " was to his Greenwich house Thus six months from December, 1936, had elapsed without any overt act or declaration evidencing a surrender of his domicile in New York.

Again on the following day — the 26th of June, 1937 — his Connecticut lawyer transmitted to him for his approval an original and two copies of a " proposed certificate of intention to become a Connecticut resident as suggested in our conversation of yesterday." Upon this letter a notation was made indicating Mr. Benjamin's concern about the possibility of the imposition of large taxes if he became a resident of Connecticut. There is also mention of a suggestion for the establishment of a revocable or irrevocable trust, " to escape taxes on bonds about $1,800,000." It is of persuasive force that Mr. Benjamin in June, 1937, did not sign the certificate of intention to become a Connecticut resident as suggested by his attorney in that State and that he refused to sign it after consultation with his New York office assistants.

Again, the indications of refusal to abandon New York are evidenced by a communication from his secretary, Mr. Manning, in the letter written a few days later on June 29, 1937.

The uncertainty of a saving in taxes by a shift of residence became a matter of worry and concern    The possibility that there would be any saving was further impaired by the fear of Mr. Benjamin's adviser that the Connecticut attorney would charge " a handsome bill " for his services    In this memorandum the further possibility that New York would be entitled to charge income taxes, approximately $30,000, based upon the fact of a six months' residence during the year 1937 was suggested.    Actually no New York State income tax was ever paid by Mr. Benjamin as a resident for any part of the year 1937.    The further suggestion made in June, 1937, by the Connecticut attorney for the creation of a revocable or irrevocable trust was also stated by Mr. Manning to involve serious problems in the payment of Federal gift taxes and it was described as a probable " case of jumping out of the frying pan into the fire."    This memorandum closes with the significant statement that the proposed certificate of intention to become a Connecticut resident was " not signed and W. E. B. did not notify Judge Tierney he was not carrying out his advice."    This notation is made over the initials of Manning and is dated August 5, 1937.    Judge Tierney was Mr  Benjamin's Connecticut attorney.

Thus almost eight months had elapsed since the first abortive attempt was made to effectuate a change of residence from one State to the other and  the decision still remained open.    The evidence clearly reveals that all during that period there was obstinate and stubborn refusal on the part of Mr. Benjamin to consent to any such change    A further expression of resistance is found in a document dated over a month later on September 27, 1937, showing discussion between Mr  Benjamin and his secretary, Mr. Manning, as to the need of registration as a voter in Connecticut. He voted in Connecticut on one occasion only — on November 8, 1938    The effect of that act will be considered hereafter in this decision.

In one of his letters written on October 5, 1937, Mr. Benjamin stated that he had purchased the Greenwich house " as a health resort to supersede or to be used in connection with my Ardsley house and the apartment."    He wrote significantly to a friend in that letter, " that is to say I keep three residences going at once." During this period of the first year of his alleged residence in Connecticut every declaration in formal documents as to his residence in Connecticut is nullified by the expression of his real, continued and undisputed intent not to surrender his domicile in New York State.

In purchasing the house at Greenwich his status there was no different from any other legal resident of New York who treated

the acquisition of a new habitation as a summer house and a subordinate place of abode.

Connecticut contends that the surrogate is limited here to a finding of domicile either at Ardsley-on-Hudson or at Greenwich, New York, on the other hand, asserts that in November, 1936, at the time of the abandonment of the Ardsley residence as a place of living by the decedent, his domicile became fixed at his apartment in New York county to which he returned at that time. In other words, New York insists that the question presented for determination is between a domicile and home in New York county and State, or a domicile and home in Connecticut. Upon this phase of the case I overrule the contention of Connecticut and sustain that of New York. Mr. Benjamin never spent a single night at Ardsley after November 15, 1936. That is an undisputed fact in the case. The surrogate has shown that the attempt to move Mr. Benjamin's dom cile to Connecticut as of December 17, 1936, was never consummated. He has shown that for a period of at least one year after the abandonment of the Ardsley house there was never an acquisition of a Connecticut domicile because of the equivocation, vacillation and resistence of the decedent evidenced so strongly in his own oral statements, writings and acts. (*Matter of Lynch*, 170 Misc. 966.) He has shown also that Mr. Benjamin never spent a single day or night at his Greenwich house between November 15, 1936, and April 30, 1937. Connecticut would accord him during this period a character which was described by Justice CLOSE as " a bird of passage " in *Matter of Johnson* (*supra*). During this period he occupied his New York apartment as his only home. The legal effect of the permanent abandonment of Ardsley was to destroy that place as a domicile. (*Matter of Trowbridge, supra; Texas* v. *Florida, supra; Matter of Leidenger*, 173 Misc. 808.) In *Texas* v. *Florida* (*supra*) the contentions of Texas of a continuance of domicile met with no recognition in the Supreme Court in the face of the continued absence of Colonel Green from that State over a period of several years before his death. His declarations were shown to have been inspired by the desire to establish a nominal residence in Texas for tax purposes, different from his actual residence in fact. " In such circumstances the actual fact as to the place of residence and decedent's real attitude and intention with respect to it as disclosed by his entire course of conduct are the controlling factors in ascertaining his domicile." (Opinion of Mr. Justice STONE, at p. 425.) Mr. Benjamin's return to his domicile of origin is strongly significant of actual intent. It is an elemental principle of the applicable law that " every person has at all times one domicil." (Restatement, Conflict of Laws, § 11;

1 Beale, Conflict of Laws, p. 122.) Since Mr. Benjamin, after the relinquishment of Ardsley, must have acquired a domicile somewhere, and since during the first part of the period there was no legal or factual basis for any other alternative residence, his intent to return to his home in New York city which was supported by actual occupancy must be found as an inevitable conclusion.

The surrogate finds as a fact, because of the strength and weight of the testimony, that his domicile was re-established in November, 1936, in New York county. It continued there unless those who contend for a change to Connecticut could establish it by sufficient evidence. They have wholly failed to sustain that burden.

It is unecessary to recite in detail the other evidence which deals with the disputed period for the years 1938 and 1939 and up to the time of his death on February 24, 1940. During that period his formal documents, consisting of income tax returns, the last two codicils to his will and papers of other character, continue to describe him as of Connecticut. These declarations are again to be tested by the motives of the persons who induced their making. They are as inconclusive as the formal declarations made in the first year of alleged change of residence from New York to Connecticut They were all parts of an attempt to vindicate an opinion, but since they never ripened into finality they are of small importance, principally because they do not accord with the conduct of the decedent They are also overcome by his contrary declarations. (*Texas* v. *Florida, supra; Matter of Johnson, supra; Matter of Lydig, supra*, 121.) Similar words of description in wills or other formal documents. inconsistent with the facts in the case, have been frequently disregarded by the courts. (*Texas* v. *Florida, supra; Matter of Mesa y Hernandez*, 172 App. Div. 467; affd., 219 N. Y. 566; *Matter of Wendel*, 144 Misc. 467.)

Connecticut places much reliance on the fact that on October 15, 1938, Mr. Benjamin " took the Elector's Oath " required in that State and actually voted there at the general election held on November 8, 1938. The act of voting, by itself, is not conclusive as to domicile (*Matter of Trowbridge, supra, Matter of Lydig, supra.*) It is one factor to be considered with others in evidence. In *Matter of Trowbridge* (*supra*), the decedent voted in New York State and even subjected himself to the payment of large income taxes there, which could have been avoided by him by a Connecticut domicile, yet he was held by the Court of Appeals to have maintained his home and place of legal residence in Connecticut. The Court of Appeals accepted the argument of Connecticut that voting was not an exclusive test of domicile.

I have stated that the facts in the pending case bear a close

resemblance to those in *Matter of Lydig (supra)*. The Commonwealth of Massachusetts intervened in the proceeding. There the domicile of origin was in New York. It continued unquestioned for many years. A summer house was acquired at Lenox, Mass. The decedent registered as a voter there, just as Mr. Benjamin did here in Connecticut. The decedent there voted only twice in the new State of abode. He paid no taxes on personal property in the State of New York. Just as Mr. Benjamin paid taxes to Connecticut in 1938 and 1939 upon personal property, Mr. Lydig paid taxes to Massachusetts " from motives of economy." There were conflicting declarations of residence. There, as here, there was no change in the mode of life of the decedent. He continued to reside at his home in New York for similar periods of time during each year. Mr. Lydig spent no more time in Massachusetts after his attempted change than he formerly did. Justice PAGE, writing for the Appellate Division, First Department, said that these " facts, taken together, tend to show a desire to have a domicile in Lenox, but there must be more shown than desire and intent to change; there must be in fact a change of domicile." He quoted an interesting comment, which is equally pertinent to the facts in our case, from *Babcock* v. *Slater* (212 Mass. 434; 99 N. E. 173): " To establish a change of domicile, fact and intent must concur. * * * The mere desire to have a domicile in a certain place with the intention that it shall be so is not enough, where, as here, there is no actual change of abode and apparently no intention of performing any of the acts which are necessary to constitute such a change. * * * The purpose to change is not enough, unless carried into execution." In the *Lydig* case the court found from the facts in the case taken as a whole, that there was not sufficient evidence to show a change of domicile from New York, which was the domicile of origin.

There are written and oral declarations in the last three years of Mr. Benjamin's life as to the manner in which he regarded his Greenwich house. In a few isolated cases he called it his home. In other cases he referred to it in his letters as his " residence " or his " permanent residence " and in one instance he called it his " permanent residence and domicile." His confused train of thought, however, is revealed in many other concurrent declarations where he called it his " permanent summer resort." At other times he variously described it as a " sanitarium," " summer resort " " health resort," " country residence " and as " an outside investment." Yet there are contradictory statements by oral declarations that he regarded New York as his home. There is credible evidence in the record that he refused to give up living in his New York apartment. He stated there was no reason why he should be

forced out of it and that he regarded it as his home. Neutralizing the effect of his declarations of residence in Connecticut, there are significant contradictory declarations over his own signature made in September and October, 1939, a few months before his death, that his " home address " was at 280 Park avenue in this county and State. These statements were made on formal cards required by a safe deposit company when he leased two safe deposit boxes for his securities. It is especially significant that they were made by him in the absence of his advisers and at a time when he was fearful of an attempt by persons surrounding him to obtain control of his vast security holdings. These declarations that his home address was in New York county represent strongly his own uninfluenced opinion and evidence their truth. Again they typify the contrast between declarations made on the advice of his attorneys and employees either in formal documents or in occasional letters, and contradictory statements, oral and written, made of his own initiative when his advisers were absent or their suggestions forgotten. The latter group of statements strongly evidence the treatment of his Park avenue apartment in New York as his real home and " his ' preeminent headquarters,' which is the essence of technical domicile." (*Texas* v. *Florida, supra,* 427; *Matter of Packard, supra.*) All of the persons connected with the affair were obviously tax conscious; however, their well-laid though poorly executed plans cannot be permitted to deprive the State of New York of the tax which is justly due it.

The determination of domicile necessarily involves a comparison of the weight of the evidence, particularly where plural homes are maintained and where the retention of the old home continues during the period of habitation in the alleged new one. The criterion is quoted in *Matter of Trowbridge (supra)*, " What was this man's general habit of life? That is always the great and leading inquiry in questions of domicile." (Cited from *Sherwood* v. *Judd,* 3 Bradf. 267, 276.) Here the attachments and ties that bind Mr. Benjamin to his true home in his apartment in New York are never broken. Moreover, financial, business and sentimental interests in that State continued until his death, and by contrast there were only minor and subordinate interests in Connecticut during the last three years of his life. In section 24 of the Restatement, Conflict of Laws, it is set forth, " When a person who has capacity to acquire a domicil of choice has more than one home, his domicil is in the earlier home, unless he regards the second home as his principal home." And again, " The intention required for the acquisition of a domicil of choice is an intention to make a home in fact, and not an intention to acquire a domicil."

(Restatement, Conflict of Laws, § 19.) The comment upon the latter rule has relevancy here. It reads, a " person sometimes desires to have his domicil in a certain place, in order to get the benefit of one or more of the legal consequences of having a domicil there, but does not wish to change his home to that place; this desire to have a domicil in a certain place has no effect in fixing his domicil there."

In the evidence presented in this proceeding there is an overwhelming display of unbroken attachment on Mr. Benjamin's part to New York — the State of his birth and long-continued residence. In the last three years of his life, which is the disputed period here, he spent the greater part of each year at his apartment in New York and a far lesser part in Connecticut. All of his securities, aggregating between $13,000,000 and $15,000,000 in value, were kept in New York county. His very large bank deposits were maintained here. At the time of his death he had in New York city banks approximately $1,800,000. By way of contrast, in Connecticut he maintained a very small checking account principally used for his summer household expenses. At the time of his death it was less than $3,000

The furnishings of his house at Ardsley and of his apartment in New York were extremely valuable compared to those of the Greenwich house. At Ardsley was kept a collection of antique religious objects. They and the furnishings and paintings there were insured for $32,000. At his New York apartment were even more valuable furnishings, a collection of autographs and of paintings insured for $161,000. That collection of paintings alone was appraised for the decedent in his lifetime at approximately $150,000. Other valuable articles of personal property were stored in a loft in this city.

When the house at Greenwich was furnished in 1937 there was moved to it some of the old furniture from Ardsley and from his apartment in New York. The carpets and rugs were worn and faded. The style of the furnishings was described as Victorian and was referred to by Mr. Benjamin in many of his letters as of the period of the " Gay Nineties." Certain articles were sent there, of more or less sentimental attachment, such as a few of his wedding presents, the furnishings of his wife's room at Ardsley, and her parasol. The conclusion is inescapable that these articles were purposely moved to attempt to create an atmosphere which had been developed from a study of the facts in *Matter of Trowbridge (supra)*. The only new furniture purchased was a dining room set, of very small value. The entire contents of the house were insured for the sum of $5,000.

Again the charitable gifts of Mr. Benjamin during the last three years of his life were predominantly associated with New York State and New York city. His contributions to Connecticut were by contrast inconsequential and again were undoubtedly motivated by a purpose to show some interest in the State of his newly-acquired house as a basis for a legal but not a factual pretension. His charitable gifts to New York institutions in the disputed period aggregated $52,000. Those in Connecticut were less than $4,000 Among his New York charitable gifts in 1937, after the alleged establishment of his residence in Connecticut, were $10,000 to his alma mater, Union College at Schenectady; $5,000 and a collection of his father's papers to Columbia University; $1,000 to the United Hospital Fund of New York City. In contrast with these gifts his contributions (according to his income tax return for 1937) to Connecticut charitable purposes amounted to $150.

In 1938 he made a gift of $7,500 to the Cornell Medical School located in New York city. He gave $10,000 to the Memorial Hospital located here; $1,000 to the United Hospital Fund of this city and $5,000 to the Museum of the City of New York.

In 1939 he contributed an additional $7,500 to the Cornell Medical School. He made a gift of the value of $5,295 to the New York Historical Society. He gave $500 to Roosevelt Hospital in this community. Even his smaller gifts made during these years were presented to religious, educational and welfare corporations and societies closely identified with the life of the city of New York

He retained his long-enduring membership in the Union League Club in New York and in the Ardsley Country Club until the time of his death. The only association in Greenwich was with the Beach Club which had summer activities only.

A large majority of his friends were New Yorkers and his friends in Connecticut were relatively few. Even his summer guests were usually from New York city. The number of the visits of his immediate family to Greenwich was exceptionally small. During the time he was in New York the contacts with the members of his family were far more intimate and frequent. The enthusiasm that he displayed in his Greenwich house after his first occupancy in 1937 is not extraordinary nor a compelling factor in favor of a determination of domicile in that State. Undoubtedly its proximity to the shore line and the fact that it was newly acquired, presented a pleasing contrast with the older house at Ardsley and his apartment home in New York city The common experience of the average person who maintains a summer and a winter residence is well summarized by Professor Beale " Throughout the year his thoughts may turn to either residence as home. Even though he

should speak and think of one of them more enthusiastically than the other, this is not necessarily a proof that he regards it predominantly as his home. ' The country house, being the place of recreation, is generally the object of the more exuberant expressions of attachment.' " (1 Beale, Conflict of Laws, p. 191, with the quotation from Lord ROBERTSON in *Huntly* v. *Gaskell*, [1906] A. C. 56, 71.)

Mr. Benjamin last occupied his house at Greenwich about October 24, 1939. He then returned to his New York apartment. His manner of living on his return to New York in the succeeding four months of his life was exactly the same as in the prior fifteen years of his occupancy of the New York apartment. In late December, 1939, he made a short visit to Atlantic City. Upon his registration at the hotel there his address was given as 280 Park avenue, New York city. In January, 1940, he returned from Atlantic City to his apartment in New York. It is significant that in the last few years of his life his New York residence was used by him as his residence address on visits to hotels, on an ocean cruise and on other occasions when he was absent from either Connecticut or New York. During that period his declarations as to a New York address or residence greatly outnumber the giving of the Connecticut address.

Concepts of the law of domicile have in recent years been somewhat changed by the leading authorities of our State and the United States Supreme Court. The trend has been away from the former policy of attributing controlling weight to the formal declarations of a decedent as indicating his choice. More regard is now given to the test of whether the place of habitation is the permanent home of a person, with the range of sentiment, feeling and permanent association with it (1 Beale, Conflict of Laws, pp. 124, 127 ) The trend of the modern decisions has in great part been caused by the increased problems of income taxes levied by the various States and by claims to estate taxes as between the contending States in cases of alleged multiple domicile.

The acquisition of a new domicile involves an intent to abandon the old dwelling place as a home. The burden of proving a change is upon the persons who assert it. Here the evidence and the inferences from it fall far short of establishing the change claimed by Connecticut and the executors. Even if the evidence was equally balanced, a finding of domicile in New York would have been required. On the contrary, in the opinion of the surrogate the great weight of the evidence shows that the domicile re-established by the decedent in November, 1936, in New York county was never changed by any decisive word or act.

The surrogate finds upon the evidence that Mr. Benjamin never abandoned his domicile in this State. He finds, moreover, that from November 16, 1936, to the date of his death the legal residence of Mr. Benjamin was at 280 Park avenue, New York city. Whatever expressions of intent were made by him to change his domicile were prospective and lacking in finality. His contemporaneous and subsequent acts and declarations from December 16, 1936, to his death nullify the definiteness and fixity of any attempt to effect a change.

Submit decree on notice accordingly.