MELLON NATIONAL BANK AND TRUST COMPANY, executor, *vs.* COMMISSIONER OF CORPORATIONS AND TAXATION.

Berkshire.     May 8, 1951. — July 13, 1951.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & WILLIAMS, JJ.

*Domicil.   Evidence,* Presumptions and burden of proof.

A domicil once established is presumed to continue until a new one is acquired.

A conclusion that the domicil of an aged, unmarried woman at the time of her death was in Pittsburgh, Pennsylvania, rather than in Lenox, Massachusetts, was required by reported facts showing, among other things, that, although for many years she had lived in places other than Pittsburgh and had been in Pittsburgh only for periodic short visits, when she stayed at a hotel there, and although she had purchased a residence in Lenox about fourteen years before her death and had occupied it for some six months each year and had had many interests in Lenox, she once had had her domicil in Pittsburgh and had always intended to retain it there, and until the time of her death had had social, religious and philanthropic interests, substantial personal property, her place of voting and filing tax returns, and her legal and financial advisers, in Pittsburgh.

PETITION, filed in the Probate Court for the county of Berkshire on July 26, 1949.

The case was heard by *Hanlon,* J.

*F. M. Myers,* (*F. M. Myers, Jr.,* with him,) for the petitioner.

*H. W. Radovsky,* Assistant Attorney General, (*G. Luftman* with him,) for the respondent.

WILKINS, J.   This is a petition for a binding declaration as to the domicil of Annie-May Hegeman at the time of her death.   The petition, purporting to be brought under G. L. (Ter. Ed.) c. 231A, inserted by St. 1945, c. 582, § 1, also conforms to the provisions of G. L. (Ter. Ed.) c. 65, § 30.

The probate judge entered a decree that she was domiciled in Lenox in this Commonwealth, rejecting the petitioner's contention that her domicil was in Pittsburgh in the Commonwealth of Pennsylvania. The petitioner appealed.

This appeal presents no question of conflict in oral testimony. Not only does none appear in the reported evidence, but the arguments addressed to us on both sides do not assail the correctness of the findings contained in the judge's report of the material facts found by him. See G. L. (Ter. Ed.) c. 215, § 11. Indeed, the appealing party expressly disclaims doing so. The present issue is the correctness of the ultimate conclusion as to domicil, the ascertainment of which is mainly a question of fact. *Feehan* v. *Tax Commissioner*, 237 Mass. 169, 171. *Levanosky* v. *Levanosky*, 311 Mass. 638, 642. *Hopkins* v. *Commissioner of Corporations & Taxation*, 320 Mass. 168, 173. Here domicil has been ascertained as a conclusion recited in the decree and drawn from primary findings stated in a full and complete report of material facts. Hence, there is no occasion to inquire whether any findings are plainly wrong when the sole dispute is confined to an inference by which we are not bound. *Poland* v. *Beal*, 192 Mass. 559, 561–562. *Old Corner Book Store* v. *Upham*, 194 Mass. 101, 106. *Mansfield* v. *Wiles*, 221 Mass. 75, 84. *Bankers Trust Co.* v. *Dockham*, 279 Mass. 199, 200. *Newburyport Society for the Relief of Aged Women* v. *Noyes*, 287 Mass. 530, 532–533. *Bratt* v. *Cox*, 290 Mass. 553, 557–558. *Veazie* v. *Staples*, 309 Mass. 123, 127. *First National Stores Inc.* v. *First National Liquor Co.* 316 Mass. 538, 540. *MacLennan* v. *MacLennan*, 316 Mass. 593, 595. See *Hurd* v. *General Electric Co.* 215 Mass. 358, 360; *Malone* v. *Walsh*, 315 Mass. 484, 490.

Annie-May Hegeman was born in New York city on May 9, 1859, and spent her minority there except when in Connecticut either at school or at the home of a grandmother. Her father died, and when the decedent was about twenty-two years of age, her mother married Henry Kirke Porter of Pittsburgh, Pennsylvania. Thereafter the three occupied as a home a large residence, known as Oak Manor,

327 Mass. 631                                            633

Mellon National Bank & Trust Co. *v*. Commissioner of Corp'ns & Tax'n.

owned by Porter in the Oakland district of Pittsburgh. Porter had accumulated a substantial fortune through the H. K. Porter Company, which he had established in Pittsburgh for the manufacture of narrow gauge locomotives. He was a civic leader and philanthropist. The decedent and her mother joined the Calvary Episcopal Church in Pittsburgh, and became very active in its affairs, the former teaching Sunday School for several years. Porter attended another church.

In 1903 Porter was elected to Congress. He, his wife, and stepdaughter took up their residence in Washington, living after the first year in a mansion purchased by him and partly furnished with furniture from Oak Manor. He served only one term in Congress, but the three continued to live in Washington and never resumed occupancy of Oak Manor. They entered into the social life of Washington. The decedent and her mother became regular attendants at St. John's Episcopal Church, where they had a pew, but they did not take their letters from Calvary Church, although urged by the Bishop of St. John's. The decedent became interested in a Washington orphanage, eventually becoming a member of the board of trustees. She was active in the work of the Smithsonian Institution and the Library of Congress. The Porters and the decedent did not usually spend more than four or five months a year in Washington. They travelled much both abroad and in this country. When not travelling, they passed the summer months at a summer residence which "they" owned at Southampton, Long Island, New York. There were vacations in Georgia, New York, Maine, or Lenox, and periods of time at a New York city hotel. They moved around a great deal, but spent far more days in Washington than in any other one place.

They made occasional visits to Pittsburgh, where most of their closest friends lived. Porter was not active in the management of the locomotive works, but was a member of the board of directors and a substantial stockholder. His counsel continued to be the same Pittsburgh law firm. The Union Trust Company of Pittsburgh, his bankers for many

years, continued in that capacity. In addition to business interests, social and philanthropic interests drew Mr. and Mrs. Porter and the decedent back to Pittsburgh from time to time. They continued to be affiliated with, and to contribute to, their Pittsburgh churches and never removed their letters. They contributed annually to other Pittsburgh charities. On their visits, which were not of long duration, they always stayed at the Schenley Hotel and not at Oak Manor. They liked Pittsburgh people and Pittsburgh institutions, but they did not like living in Pittsburgh. The fog and smoke did not agree with them. During World War I they turned Oak Manor over to the Red Cross, and after the war it remained unoccupied.

Porter died at Washington on April 10, 1921, at the age of eighty-four. He was buried at Pittsburgh, and his will was probated there. Thereafter Mrs. Porter and the decedent lived in the Washington house. Shortly after his death Mrs. Porter disposed of Oak Manor by gift to the University of Pittsburgh. The following summer they were at Southampton and the next two at Lenox. On February 12, 1925, Mrs. Porter died at Washington at the age of ninety. She was buried in Pittsburgh, and her will was probated there.

After her mother's death the decedent lived in Washington, except for trips to Europe and temporary sojourns in resort areas. She kept up the practice of her mother and herself of spending the summer and autumn at Lenox, where she usually stayed at a hotel, but once or twice leased a place for the season. Occasionally she would interrupt her stay at Lenox to spend two weeks at some Maine resort. In 1932 she sold the Southampton house.

In May, 1934, the decedent purchased a house in Lenox for $27,500. It was a substantial residence of fifteen rooms, built for year round occupancy, and surrounded by extensive grounds. There was a two car garage. She called the place "Anne's Acres."

She continued to hold the Washington house, in the charge of a caretaker, until 1938, when she conveyed it as a

gift to the Library of Congress Trust Fund Board. She had taken much of its furniture and furnishings to use in the Lenox house, and completed its dismantling in 1937. The Lenox house was also furnished with articles from the Southampton house which had been in storage in New York and with new articles purchased in New York.

After purchasing the Lenox property, the decedent used to go there annually around the middle or latter part of May and to remain about six months. The house was opened and made ready for occupancy on May 15, and she arrived shortly thereafter. She usually stayed until the latter part of November, and on several occasions remained until after Thanksgiving. Her winters were spent in New York city, where for several years she leased an apartment the year round. It was furnished with her own things, some of which had been brought from the Washington house. In 1942 she gave up this apartment, and thereafter spent her winters at the Mayfair Hotel, where she retained a suite continuously until she died. That suite was partially furnished by her.

In 1946 because of the servant problem the decedent could not open the house. She spent the summer at a Lenox hotel, but went daily to the house and received her mail there. She resumed occupancy of the house during the summer of 1947. In 1948 she came to Lenox in the spring and had the house opened. She went back to New York city, where she had to remain, unable to return to Lenox because of failing health. Her death occurred at the Mayfair Hotel on November 7, 1948.

A few weeks earlier she gave instructions relative to her funeral to an officer of her Pittsburgh bank who visited her at her New York apartment. She wanted the services to be held at Calvary Church, and none to be held in New York. Nevertheless a short service was held in New York which was attended by nine people. The principal service at the Pittsburgh church was attended by between one hundred fifty and two hundred, mostly friends of hers in that city. She was buried at Pittsburgh with her mother and stepfather.

"During all these years" the decedent made occasional

trips to Pittsburgh, averaging two a year. She always stayed at a suite in the Schenley Hotel, but had no lease and did not always occupy the same suite. Her visits, lasting from two days to two weeks, were usually to consult with her lawyers or bankers. All through the years the law firm of her stepfather had continued to do most of her legal work. Her will was drawn and probated in Pittsburgh by that firm. The will was executed by her at their Pittsburgh law office on April 25, 1946. A codicil, dated March 3, 1948, was drawn by a member of that firm, but was executed in New York. The Union Trust Company, later merged with the petitioner, always handled her finances and was named executor of her will. She had a safety deposit box at that bank where she kept her securities and some jewelry. Other personal property was stored by her at a storage company in Pittsburgh. She relied heavily on her Pittsburgh lawyers and bankers for advice on business and even on some personal matters, corresponding with them frequently.

In Pittsburgh she visited old friends. There she knew at least ten people who had been close acquaintances when she lived at Oak Manor. Another object in going to Pittsburgh was to vote or to register for voting. She never voted elsewhere. Because of absence from the city she usually had to register anew for each election. Her last vote was at the presidential election in 1940. The last trip to Pittsburgh was in April, 1946, to make her will. She remained from April 17 to 29. She thought it advisable to be seen at the Schenley Hotel at least once a year to establish a residence.

In Lenox the decedent was interested in community affairs. She attended Trinity Church and contributed to its support, but declined to take her letter from Calvary Church. She participated in Victory Loan campaigns in World War II, usually subscribing $5,000. She worked for the Red Cross. She was greatly interested in the Lenox Library, serving on the book committee, and from 1939 on being a member of the board of managers. She made a gift of $5,000 to the library to establish a building fund.

In her Lenox house she employed one man the year round,

and, when needed, a part time assistant. She had three servants in addition to her personal maid, who was with her the year round. She liked Lenox and always dreaded closing the house and going to New York for the winter. She believed the Lenox climate helped her arthritis. She enjoyed leisure in Lenox, reading a great deal and usually taking a drive in the afternoon. She frequently attended performances at a summer theatre in Stockbridge, and occasionally went to concerts at nearby Tanglewood, the site of the Berkshire Music Center. She had several friends in the town. She had a safety deposit box in a Lenox bank, and carried, through a Lenox agency, fire insurance on her house and workmen's compensation insurance on her employees in Lenox and elsewhere. Although just before her death she talked of selling the Lenox property, she never put it on the market. During her later years she suffered from heart trouble, as well as arthritis, and was attended by a New York physician.

The decedent always spoke of herself as a "Pittsburgher," and in registering at hotels usually listed herself as of Pittsburgh, but on at least one occasion she registered as of Washington and on another as of Lenox. She wished to be regarded as a resident of Pittsburgh, and in 1938 was quite concerned because a Washington lawyer had told her that, from a standpoint of domicil, she was "caught in a net, with an apartment in New York and a house in Lenox." She had a strong affection for Pittsburgh and its people and institutions. During the war she subscribed for bonds in the campaigns there to the same extent that she did in Lenox. She contributed annually to Calvary Church and to Pittsburgh charities. She gave $5,000 to one Pittsburgh organization to aid in building a boys' camp. In her will and codicil she described herself as of Pittsburgh. Not long before her death, in talking with her Pittsburgh attorney at her New York apartment, she referred to Pittsburgh as her home. She "had no actual home there subsequent to 1903 when Mr. Porter moved to Washington." She referred to Oak Manor as her home, though she never stayed there

after leaving in 1903. After Oak Manor was conveyed in 1921, she referred to the Hotel Schenley as her Pittsburgh residence. She had no property interests in Pittsburgh other than her securities in the bank and the articles in storage. All the family stock in the H. K. Porter Company had been disposed of by her and by her mother's executor in 1925.

The foregoing facts were found by the probate judge.

The inventory and appraisement of the estate filed in Allegheny County, Pennsylvania, showed a total valuation of $2,105,372.30, chiefly securities, many of Pennsylvania corporations. A checking account with the petitioner had a balance of $6,463.84. The tangible personal property comprised vases $3,000, glassware and china $3,600, jewelry $49,115, and silverware $3,179. The inventory filed in the Registry of Probate, Berkshire County, following allowance as a foreign will, showed real estate $30,500; and personal estate $6,846.15, consisting of the furnishings of the Lenox house later sold at public auction for $26,000. The will left much of the estate to Pennsylvania charities and to members of the Porter family none of whom lives in Pennsylvania.

The decedent never paid a Massachusetts income tax, but did pay local intangible personal property taxes assessed against residents of Pittsburgh. Her Federal tax return was filed from Pittsburgh.

It is not questioned that at one time the domicil of the decedent was in Pittsburgh, where she was physically present residing with her mother and stepfather in a house owned by him. In that city there was then a concurrence of all her interests, family, religious, philanthropic, and social. It is a general rule that the burden of showing a change of domicil is upon the party asserting the change. *Commonwealth* v. *Bogigian,* 265 Mass. 531, 538. *Commonwealth* v. *Davis,* 284 Mass. 41, 49. *Texas* v. *Florida,* 306 U. S. 398, 427. Here the burden is upon the commissioner who seeks to establish the tax. *New England Trust Co.* v. *Commissioner of Corporations & Taxation,* 315 Mass. 639, 642. *Hopkins* v. *Commissioner of Corporations & Taxation,* 320 Mass. 168, 173.

The respondent asserts that the decedent acquired a domicil in this Commonwealth about the year 1934. As a step in the contention, it is argued that Washington became her domicil in 1904, when the Washington house was purchased by Porter, or in 1905, when the Congressional term expired, or in 1925, after the death of Mrs. Porter following the disposal of Oak Manor.

The commissioner in support of the burden of proof refers to certain findings in the report of material facts and to some evidence which could lead to additional findings by us. See *Reynolds* v. *Missouri, Kansas & Texas Railway,* 224 Mass. 379, 384. Of the judge's subsidiary findings, those most relied upon are the absence of a fixed place of consecutive abode in Pittsburgh since 1903; the purchase of the Lenox property, which was fitted for year round occupancy, furnished in part with articles from the Southampton and Washington houses, and looked after by a year round caretaker; the lack of real estate ownership elsewhere after 1938; the occupation of the Lenox house from May to November in virtually every year from 1934 through 1947, sometimes for slightly more than six months; a dread of closing the house and going to New York for the winter; and attendance at the summer theatre or outdoor concerts. There is also reliance upon an active participation in Lenox community affairs, notably the library; generous local charitable contributions; a safety deposit box, contents not shown, in a Lenox bank; fire and workmen's compensation insurance placed locally; and the more nearly permanent tenure at the New York hotel than at the Pittsburgh hotel.

The evidence upon which no express findings were made and upon which the respondent relies includes the presence in the Lenox house of a cherished collection of items purchased abroad, the quality of the furnishings, and a large library; statements by Miss Hegeman to a woman employee who opened and closed her house that "she loved Lenox, loved the town, and loved her home there," and that "She called Lenox her home, my home in Lenox"; and other matters which, with one exception, it is not necessary

to mention. That exception is a letter written from New York city on March 4, 1934, to an officer of her Pittsburgh bank, announcing the purchase of the Lenox real estate, and saying, "It is a relief to have the summer question settled for I am tired of adjusting myself to other people's belongings. I have enjoyed my winter here and if I did not have the Washington house should settle here. New York gives one so much and one leads a much more independent life in a large city." This, it is argued, was a statement that she would settle in Lenox if she did not have the Washington house. The quoted portion of the letter, however, shows, to the contrary, that her intention was adverse to settling in Lenox.

On the other hand, it is a fair statement that in so far as Miss Hegeman could control the legal result by her own intent, she never had a purpose to make Lenox her domicil. See *Thayer* v. *Boston,* 124 Mass. 132, 146; *Viles* v. *Waltham,* 157 Mass. 542, 543. She described herself as of Pittsburgh with almost complete uniformity. All her tax returns were filed from there. Not only was her intended domicil in Pittsburgh, but so were the main body of her friends, her church, her securities, her lawyers, her bankers, her voting interests, and her family cemetery lot. She kept tangible personal property in Pittsburgh to a greater value than at Lenox, and maintained her charitable interests to a degree equal with Lenox. That her relationship with the Schenley Hotel was wholly informal and not the subject of any lease, resulting in the irregular occupancy for a few weeks or days on the average of twice a year of various suites, is not fatal to the retention of her Pittsburgh domicil. *In re Craignish,* [1892] 3 Ch. 180, 192. *Perkins* v. *Davis,* 109 Mass. 239. *Winans* v. *Winans,* 205 Mass. 388, 392. *Emery* v. *Emery,* 218 Mass. 227. Restatement: Conflict of Laws, § 13, comment b. Beale, Conflict of Laws, §§ 9.6, 13.2.

A domicil once established is presumed to continue until a new one is acquired. *Commonwealth* v. *Bogigian,* 265 Mass. 531, 538. To effect a change, there must be "compelling evidence." *Commonwealth* v. *Davis,* 284 Mass.

41, 49. A new domicil "is acquired only by a clear and honest purpose to change, which is carried into actual execution." *Thayer* v. *Boston*, 124 Mass. 132, 147. The burden of showing acquisition of a new domicil is not satisfied in these circumstances where the decedent at the age of seventy-five purchased real estate used as a summer and fall residence in a climate she deemed more congenial to health, at an investment of less than two per cent of the valuation of her estate at death, and in a community where were lacking most of the interests which the decedent had retained for more than sixty years in Pittsburgh. See *Tuells* v. *Flint*, 283 Mass. 106, 109; *Texas* v. *Florida*, 306 U. S. 398, 427.

The decree is reversed, and a new decree is to be entered declaring that on the date of her death the decedent was domiciled in Pittsburgh, Pennsylvania.

*So ordered.*