JAMES A. LYON, JR., EXECUTOR OF THE ESTATE OF OLIVE R. LYON, PLAINTIFF-APPELLANT, v. SIDNEY GLASER, ACTING DIRECTOR OF THE DIVISION OF TAXATION OF THE STATE OF NEW JERSEY, GEORGE F. KUGLER, JR., ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND JOSEPH M. McCRANE, TREASURER OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued January 10, 1972—Decided March 6, 1972.

*Mr. Harold A. Price* argued the cause for plaintiff-appellant (*Messrs. Schenck, Price, Smith & King,* attorneys; *Mr. Leonard M. Segal,* of counsel).

*Mr. Herbert K. Glickman,* Deputy Attorney General, argued the cause for defendants-respondents (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

FRANCIS, J. On March 30, 1967 Olive R. Lyon, 85 years of age, died in the University Hospital, Baltimore, Maryland, less than 24 hours after being hospitalized with a heart attack. Although a resident of New Jersey for a great many years, she had been living with her son in Baltimore for a considerable period before her death. The New Jersey Transfer Inheritance Tax Bureau held that her Baltimore abode did not change her status as a New Jersery domiciliary, and so imposed an inheritance tax on her estate in accordance with *N. J. S. A.* 54:34–1, subd. a. The Appellate Division affirmed the assessment in an unreported *per curiam* opinion. We granted the Executor's petition for certification. 58 *N. J.* 435 (1971).

The section of the Transfer Inheritance Tax Act referred to provides that a tax shall be imposed upon the transfer of real or personal property of the value of $500 or over,

a. Where real or tangible personal property situated in this State or intangible personal property wherever situated is transferred by will or by the intestate laws of this State from a resident of this State dying seized or possessed thereof.

In this statutory context "resident" means domiciliary, and "residence," when spoken of for purposes of imposition of the tax, signifies "domicil." *In re Estate of Gillmore,* 101 *N. J. Super.* 77, 85–87 (App. Div.), certif. den. 52 *N. J.* 175 (1968); *In re Fisher,* 13 *N. J. Super.* 48, 55 (App. Div. 1951); *In re Rueff's Estate,* 157 *Misc.* 680, 284 *N. Y. S.*

426 (Sur. Ct. 1935), aff'd mem. 249 *App. Div.* 617, 292 *N. Y. S.* 183 (1936), app. dis. 273 *N. Y.* 530, 7 *N. E.* 2d 677 (1937). Here they are convertible terms. Domicil is very much a matter of the mind — of intention. One may be acquired, or changed to a new one, when there is a concurrence of certain elements; *i. e.,* an actual and physical taking up of an abode in a particular State, accompanied by an intention to make his home there permanently or at least indefinitely, and to abandon his old domicil. A person has the right to choose his own domicil, and his motive in doing so is immaterial. The change may be made to avoid taxation, so long as the necessary ingredients for establishment. of the new domicil are present.[1] A very short period of residence in a given place may be sufficient to show domicil, but mere residence, regardless of its length, is not sufficient. It has been said that concurrence, even for a moment, of physical presence at a dwelling place with the intention of making it a permanent abode, effects a change of domicil. And once established, the domicil continues until a new one is found to have been acquired through an application of the same tests. *In re Fisher, supra; Cromwell v. Neeld,* 15 *N. J. Super.* 296, 300–301 (App. Div. 1951); *In re Dorrance,* 115 *N. J. Eq.* 268, 274–275 (Prerog. Ct. 1934), aff'd *per curiam sub nom. Dorrance v. Thayer-Martin,* 13 *N. J. Misc.* 168 (Sup. Ct. 1935), aff'd *o. b.* 116 *N. J. L.* 362 (E. & A. 1936); *Slater v. Munroe,* 313 *Mass.* 538, 48 *N. E.* 2d 149 (1943); *State ex rel. Orr v. Buder,* 308 *Md.* 237, 271 *S. W.* 508 (1925); *In re Appleby's Estate,* 106 *N. Y. S.* 2d 294 (Sur. Ct. 1951), aff'd mem. 279 *App.* 993, 112 *N. Y. S.* 2d 493 (1952); *Schillerstrom v. Schillerstrom,* 75 *N. D.* 667, 32 *N. W.* 2d 106 (1948); 25 *Am. Jur.* 2d *Domicil,* §§ 16, 17, pp. 13–15 (1966); *Restatement (Second) of Conflicts of Laws,* §§ 15–19, pp. 61–79 (1971). Since the con-

---

[1]Compare, when the required ingredients are not present. *In re Hoff's Estate,* 178 *Misc.* 515, 520, 35 *N. Y. S.* 2d 60, 65 (Sur. Ct. 1942).

cept of domicil involves the concurrence of physical presence in a particular State, and an intention to make that State one's home, determination of a disputed issue on the subject requires an evaluation of all the facts and circumstances of the case.

In the proceeding in the Transfer Inheritance Tax Bureau no testimony was taken. The question of Mrs. Lyon's domicil at the time of her death was decided solely on the basis of affidavits and documents submitted on behalf of her estate. The appeal to the Appellate Division from the determination that she was a New Jersey domiciliary on the critical date, and her estate therefore taxable, was confined to the record so made.

It appears that Mrs. Lyon was born in New Jersey on March 13, 1882. She lived here from infancy and throughout her married life until her husband, James A. Lyon, died on March 15, 1965. Their entire marital life was spent in the home owned by them at 721 Turnpike, Pompton Plains, New Jersey. Some years before Lyon's death, their son and only child, Dr. James A. Lyon, Jr., had taken up residence, and the practice of medicine in Baltimore. He was living there with his wife and children during the period with which we are principally concerned here.

When her husband died, Mrs. Lyon was 83 years of age, and although not an invalid and apparently not suffering from any malady requiring constant medical care or confinement, she had the physical infirmity commonly found in a person of her age. Following the loss of her husband she was alone in the Pompton Plains home until a married niece came to stay with her temporarily. According to the niece, Mrs. Lyon had outlived most of her close friends and very few persons visited her. With the exception of an invalid brother of advanced age, her closest relatives were her son and grandchildren in Maryland. The niece asserted also in her affidavit that the loss of her husband imposed a great emotional strain on Mrs. Lyon, and it soon became apparent that she would not be able to remain in her home.

The affidavits show that prior to James Lyon's death, Dr. Lyon had asked his parents to live with him in Maryland, and agreed to build an addition on his home to provide comfortable living quarters for them. Apparently the addition, consisting of a bedroom, sitting room and bath, had been completed some unstated time before his father's death. Upon the father's death, Dr. Lyon renewed the request that his mother move to his Baltimore home. Four weeks thereafter, in mid-April 1965, he drove her to Baltimore. It seems fair to say from the record that at this time some doubt existed as to whether Mrs. Lyon had made up her mind definitely to live permanently with her son. However, on her arrival in Baltimore, it was obvious that she was suffering from the infirmities of her age, and a long standing heart condition. Soon after her arrival she was examined by a heart specialist who recommended that she move to Baltimore where her son could look after her. This doctor saw her on four occasions in 1965, and thereafter at two or three month intervals until her death on March 30, 1967. He said in his affidavit that it was his opinion, with which she came to agree, that she could not take care of herself alone at her New Jersey home.

When Mrs. Lyon came to Baltimore she brought all of her clothing, summer and winter, her furs and silverware. Thereafter she kept her furs stored at a department store in Baltimore. It was not necessary to move the furniture from her Pompton Plains home because the living quarters in her son's house were already furnished. However, she did arrange to have a few of her favorite pieces delivered there. After April 1965 she never again lived in Pompton Plains, except for one month visits in the summer of 1965 and 1966. The house there was not sold, apparently for sentimental reasons, and so she could see her few remaining friends in New Jersey, when she wished. It is noteworthy in this connection that in conversation with the minister of the church she and her husband had attended in Pompton Plains, she told him she was reluctant to dispose of the house there because she and her husband had lived in it

throughout their married life. Moreover, she could afford to keep the property, as she did not need the money a sale would bring. Except for a two months' stay at her son's summer home at Long Beach Island at the New Jersey shore in the summer of 1965 and 1966 and the one month visit thereafter to the Pompton Plains house, she spent all of her time in Baltimore. On these visits to New Jersey she brought along only such clothes as would be appropriate for the period involved.

Undisputed affidavits of Mrs. Lyon's niece, acquaintances, and the minister of her former church in Pompton Plains refer to declarations by her after her removal to Baltimore that she was happy there with her son and grandchildren, and that she considered her son's home as her permanent residence. These declarations, although hearsay, are of course admissible and have a substantial probative value on the issue of domicil. *In re Harrison,* 20 *N. J. Super.* 162, 170–171 (Cty. Ct. 1952); 25 *Am. Jur.* 2d, *supra, Domicil,* § 89, pp. 63–64. Obviously, Mrs. Lyon's declarations, made without any object or inducement to deceive the disinterested persons to whom she made them, are very strong evidence of her intention. Moreover, on moving to Baltimore she arranged with the Pompton Plains Post Office to send her mail to the new address, and that instruction was never changed. After April 1965 she no longer remained an active member of any religious organization, club or society in New Jersey. In 1966 and 1967 her federal income tax returns bearing the Maryland address were filed with the District Director of Internal Revenue in Baltimore.

In December 1965 a practical nurse who lived in Baltimore was engaged as a companion for Mrs. Lyon. The nurse's affidavit says her hours at Dr. Lyon's home were from 8:30 A.M. to 4:30 P.M., five days a week. Her services were not required because of Mrs. Lyon's physical or mental health, but because she was lonely after the death of her husband, and Dr. and Mrs. Lyon were busy with their own affairs and family and so could not devote their entire time

to her. However, they were able to provide companionship on evenings and week-ends.

According to the companion, Mrs. Lyon spoke often of her son's home as her home, and said she would spend the rest of her days in Maryland; further that she would not think of living anywhere else and would never return to New Jersey on a permanent basis. One of her greatest pleasures was helping her grandchildren in the evening with their homework. She was plainly devoted to her only son and his family, and she had made him executor and sole beneficiary under her will. In her affidavit the companion said also that on leaving for New Jersey in the summer of 1966 Mrs. Lyon asked her not to make any commitments for the fall because she wished her to continue in her companion status. During the summer Mrs. Lyon telephoned her and on one occasion told her she "would be home soon," meaning the Baltimore home.

On March 29, 1967, almost two years after coming to her son's Baltimore home, Mrs. Lyon suffered a heart attack and was taken to the University of Maryland Hospital. The record gives her permanent address at the time of admission as 301 South Wind Road, Baltimore, Maryland. Her admission was classed as "emergency" and it appears that Dr. Lyon had given his consent to the necessary treatment or surgery. Upon her death — the next day — the death certificate was prepared by Dr. William H. Barker, Jr., a staff physician. He noted her Baltimore home address thereon in ink. Copies of this certificate were given to the funeral director who had charge of her burial in the plot in Pompton Plains, New Jersey, where her husband had been interred. The death certificate issued by the Baltimore City Bureau of Vital Records lists her address as 721 Turnpike, Pompton Plains, New Jersey, and at the bottom contains the name of the funeral director in script. The New Jersey address is typewritten but the rest of the form is printed in ink, obviously by Dr. Barker. As noted, the death certificate as prepared by the doctor at the hospital bears the Baltimore

home address in his printing, but the City's certificate contains a typewritten change to the Pompton Plains address. The affidavits of the persons involved at the hospital all reveal beyond question that they neither changed nor authorized a change in Mrs. Lyon's home address; and Dr. Lyon asserts that the death certificate was prepared without consultation with him. The strong inference is that the change was made by the funeral director probably because of the Pompton Plains burial. The inference could not be verified because the funeral director has since died. All things considered, the New Jersey address on the death certificate is not entitled to any significant evidentiary force on the issue of domicil.

At the time of her death Mrs. Lyon had two safe deposit boxes, one in a Pompton Lakes bank and the other in a Pompton Plains bank, registered in the names of her late husband and herself. These boxes contained a substantial number of stock certificates of various companies, registered in her name, including 290 shares of Northern States Power Co., three cemetery deeds and some inexpensive jewelry. In addition she had four fairly substantial and two small bank and savings and loan association accounts in North Jersey, and one small account in a New Jersey shore community bank. The safe deposit boxes had been rented by Mrs. Lyon's husband and she had never bothered to give them up, or to move their contents to Baltimore. The stock certificates contained therein were registered on the books of the cerporations involved at her Pompton Plains address, and had not been changed when she moved to her son's home. The one exception was the certificate for the 290 shares of Northern States Power Co. The record for these shares had been changed to the Baltimore address. Dr. Lyon and his mother were co-executors of her husband's estate. Apparently, the shares of stock had come to her through the husband's estate, and in January 1967 Mrs. Lyon had told Dr. Lyon that her address on the various company books ought to be noted as her Baltimore address. However, at her death three

months later, he had accomplished the change only for the shares of the Northern States Power Co.

With respect to the various New Jersey bank and savings and loan association accounts, it appears that they had been opened by her husband many years earlier, and since he had arranged them and it was not inconvenient she was content to leave them there.

In addition she owned four parcels of real property of the total value of $53,500, consisting of the Pompton Plains place, a small Pompton Lakes house, which had been rented at $140 monthly, and two vacant lots in the Borough of Ringwood.

The affidavits submitted by the estate, as described above, represented the only proof on the issue of Mrs. Lyon's domicil at the time of her death.

No trial type hearing was held, and the Bureau made no request for the appearance of the affiants or for an opportunity to cross-examine them. However, the Examiner without any analysis of the sworn facts concluded that Mrs. Lyon had never abandoned her New Jersey domicil, that she was only a "guest" in the Baltimore home of her son, and that she was a domiciliary of New Jersey at the time of her death. In doing so, he noted that her assets were in this State, citing the two safe deposit boxes with their contents of securities in the New Jersey banks and her bank accounts. He pointed out also that she had retained ownership of her home and the furniture therein at 721 Turnpike, Pompton Plains. And said that "The decedent continued to return to New Jersey and 'she was looking forward to returning to New Jersey to visit * * *,' as per affidavit of May 1, 1968 of her niece, Hilda B. Failmezger." These facts which were apparently regarded as critical and decisive, were not viewed or evaluated in light of the entire factual complex revealed by the affidavits. Nor was anything said in criticism of or attack on the credibility of the statements of the affiants which unqualifiedly in-

dicated a permanent and intentional transfer of decedent's domicil to Maryland.

Retention of the home and the furniture therein in Pompton Plains where Mrs. Lyon and her husband had spent their entire married life, was given prominence in the Examiner's short memorandum. The uncontradicted explanation of the reason for doing so was ignored. Instead it was said that Mrs. Lyon continued to come to New Jersey. As an indication of the significance of that fact, the Examiner unfairly added the out of context quote from her niece's affidavit that "she was looking forward to returning to New Jersey to visit * * *." The preceding sentence in the affidavit says, "During the time I was with her in Maryland, her manner indicated that she took for granted that her son's home was her home." The affidavit continued, "She was looking forward to returning to New Jersey to visit, and especially to visit at her son's summer home on Long Beach Isle. Her desires were couched in terms of a visit and not in terms of returning to her former home." The Examiner's reference to this affidavit also ignores the niece's sworn assertion that "[a]lthough the decedent never told me in explicit words that 'my domicile is now in Maryland,' from personal knowledge I know that decedent realized and intended to make her home with her son and grandchildren in Maryland." In view of the full facts submitted, the Bureau's use of Mrs. Lyon's two annual summer visits to her former home, and the niece's reference to such visits, as a continued recognition of New Jersey as her domicil was to give those visits a significance wholly disproportionate to their actual probative value.

Retention of the Pompton Plains property and the furniture therein was adequately explained in relation to the issue of domicil. Mrs. Lyon was 83 years of age at her husband's death and in possession of a substantial estate. She did not need the proceeds that sale of the house or the furniture would bring, and the furniture (except for a few treasured pieces she wished to keep around her) was not required for

her apartment in her son's home. Moreover, she had an emotional attachment to the place as the sole marital home of herself and her husband, and when she resolved to make the son's home in Baltimore her permanent abode, retention of the Pompton Plains home for an annual visit to see a few old friends and to visit her husband's nearby grave, was not inconsistent with the acquisition of a new domicil. A mere sentimental attachment does not hold an old domicil. *District of Columbia v. Murphy*, 314 *U. S.* 441, 456, 62 S. Ct. 303, 86 *L. Ed.* 329, 338 (1941).

The Examiner's report refers to the appearance of the Pompton Plains address on the Baltimore City Health Department death certificate as the place of "usual residence." The error of that statement was clearly demonstrated by the uncontradicted, and thoroughly credible affidavits and documents submitted by the estate. To ignore the explanation is to make a fact of an error.

Nor can Mrs. Lyon's mere passive continuance in the New Jersey banks of the two safe deposit boxes with their contents of securities, under the circumstances present here furnish substantial evidence of an intention to retain a domicil in this State. The boxes were obtained years earlier by her husband, and the bank accounts, largely savings in character, were opened by him. To permit a situation of substantial repose to exist with respect to them was consistent with the twilight stage of her life, her affectionate regard for her husband's memory, and her obvious lack of need for those assets.

In its review of the Bureau's holding that Mrs. Lyon's domicil was still in New Jersey at the time of her death, the Appellate Division neither considered the nature of the hearing held below, nor did it engage in an independent evaluation of the evidence. Its concern was not "with the Bureau's reasoning but merely with its determination." According to the *per curiam* opinion the Appellate Division felt that its function was not to consider the weight of the evidence but simply to decide if the record contained sub-

stantial credible evidence supporting the Bureau's determination of New Jersey domicil. Without considering the affidavits "anew," it concluded they met the test of supplying sufficient credible evidence to justify the Bureau's decision.

A study of the record impresses us with the need for reexamination and restatement of applicable procedural and substantive principles in this type of case.

Determination of the issue of domicil by the Bureau for purposes of inheritance taxation is *quasi*-judicial in character. *Kellogg v. Martin,* 130 *N. J. Eq.* 338, 341 (Prerog. Ct. 1941). However, even though disputes concerning substantial property rights are involved frequently in the administration of the Transfer Inheritance Tax Act, *N. J. S. A.* 54:33–1 *et seq.,* it has not been the practice of the Bureau to engage in trial type hearings thereon. Decisions are commonly rendered after informal conferences or correspondence with representatives of the estate, and upon affidavits and various documents. Moreover, as in the present case, the decisions on disputed facts, or on uncontradicted facts from which conflicting inferences may be drawn, have usually been conclusory rather than adjudicative in character, *i. e.,* without an analysis of the discordant facts, and an explanation of the reasoning process which led to the acceptance of the particular facts or inferences therefrom on which the ultimate conclusion was reached. In the past this Court has been critical of fact findings which lack the necessary adjudicative quality. Witness *In re Estate of Anne Boyd Lichtenstein,* 52 *N. J.* 553, 571 (1968), where it was said that "[t]he Bureau's so-called findings 'of evidentiary facts' amount to little more than a synopsis of the averments of each affiant, largely cast in the light most favorable to it, followed by a summary of the reasons leading to the ultimate finding of taxability."

The informal nature of the Bureau proceedings (although frequently engaged in without objection by the estate involved) has given rise over the years to questions as to the proper scope of appellate review of its decisions. Without

regard to the subject matter of the case on appeal, *i. e.*, whether it involved a problem of valuation, domicil, or transfers or gifts in contemplation of death, etc., many of the early cases which, under the then existing statute, were reviewed by the Ordinary or Vice-Ordinary, declined to recognize a right to *de novo* review. Generally, it was said that if the Bureau decision was supported by substantial evidence the court would not reweigh the evidence, even in a case where it would have arrived at a different result. *Renwick v. Martin,* 126 *N. J. Eq.* 564 (Prerog. Ct. 1939) ; *Spalding v. Thayer Martin,* 119 *N. J. Eq.* 603 (Prerog. Ct. 1936) ; *Schweinler v. Thayer-Martin,* 117 *N. J. Eq.* 67 (Prerog. Ct. 1934), aff'd 13 *N. J. Misc.* 722, 180 *A.* 774 (Sup. Ct. 1935) ; *In re Dupignac,* 96 *N. J. Eq.* 284, 288 (Prerog. Ct. 1924) ; *In re Hall,* 94 *N. J. Eq.* 398, 406 (Prerog. Ct.), modified 99 *N. J. L.* 1 (Sup. Ct. 1923), aff'd *o. b.* 100 *N. J. L.* 405 (E. & A. 1924) ; *In re Pierce's Estate,* 89 *N. J. Eq.* 171 (Prerog. Ct. 1918).

Later cases rejected that rule and approved a *de novo* review on appeal. Undoubtedly the change was stimulated by a realization of the informal nature of the Bureau proceeding, and because it occupied a position which required it "to initiate and prosecute the tax proceeding as well as to sit in judgment therein." As the Prerogative Court said further in *Kellogg v. Martin,* 130 *N. J. Eq.* 338, 342 (1941), "It is quite advisable, therefore, that there should be opportunity for review of the factual determinations of the Tax Commissioner * * *." See also *Hanstein v. Kelly,* 131 *N. J. Eq.* 132 (Prerog. Ct. 1942) ; *Cairns v. Martin,* 130 *N. J. Eq.* 313, 328–329 (Prerog. Ct. 1941). And in 1945 the former Supreme Court commenting on the new principle said that the old "doctrine was renounced by that court in *Kellogg v. Martin* * * * and rightly so, because, while the state must be protected and tax evasions should not be tolerated, there is a duty to the individual that is equally solemn." *Grell v. Kelly,* 132 *N. J. L.* 450, 452 (Sup. Ct. 1945). In our judgment the obligation of the judicial de-

partment to engage in an independent evaluation of the facts on appeal from a Bureau determination in a contested issue of domicil is the applicable requirement, and must continue as such, at least until a more formal hearing and adjudicative process is adopted by that agency. This course is entirely compatible with *N. J. S. A.* 54:33–2 (L. 1953, c. 51, § 138, p. 923), which ordains that "The Appellate Division of the Superior Court on appeal shall have jurisdiction to hear and determine *all* questions in relation to a tax levied under the provisions of" (the Transfer Inheritance Tax Act). (Emphasis added).

Since the inception of the proceedings in this case, pursuant to the Administrative Procedure Act, *N. J. S. A.* 52:14B–1 *et seq.* (which became effective September 1, 1969, and which was not to be deemed to affect any agency proceedings initiated prior to that date, *N. J. S. A.* 52:14B–13), and within the authority of *N. J. S. A.* 54:50–3 to 54:50–6, and 54:1–16 and 17, the Acting Director of the Division of Taxation approved regulations governing hearings and procedure in connection therewith in the Transfer Inheritance Tax Bureau. For reference purposes these regulations have been designated by the Director of the Division of Administrative Procedure as *N. J. A. C.* 18:26–156 (1969). Subsection A provides for informal hearings on any issues on a conference basis at the request of the taxpayer. Subsection B provides for formal hearings, at which all evidence "shall be taken before a court reporter" and "[e]very party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence and to conduct such cross-examination as may be required for the full disclosure of the facts." Common law or statutory rules of evidence are not to be binding on the parties at the hearing. Under subsection B(2) "after all parties have been given the opportunity of presenting all the evidence in support of the issues, the Bureau shall take the matter under advisement and reach a determination on the record and the facts disclosed * * *." Subsection B(3) further provides that

after an informal conference or formal hearing, and either before or after a determination is made, either the Bureau or taxpayer or other party in interest may request a second hearing or conference to present any additional matter relevant to the issue.

We assume that Regulation 156B and its subsections contemplate a trial type hearing to be concluded by specific findings of fact with respect to the litigated issues, and conclusions of law based thereon. What effect this regulation will have on future appeals to the Appellate Division from decisions of the Bureau following formal hearings need not be decided at this time. Experience with its operation will determine whether the *de novo* review shall be continued in the Appellate Division, or whether the substantial evidence test shall be applied.

With respect to the scope of appellate review of determinations of the Bureau following consent informal hearings or conferences, a more serious problem will be presented. Obviously, it will be important for the parties to make certain that a proper record of the issues involved is established, and that adequate findings of fact and conclusions of law are made by the Bureau. And here, it must be kept in mind that if problems of credibility arise out of affidavits or documents presented at such informal proceedings, ordinarily their resolution is difficult in the absence of examination and cross-examination. In such cases, where an inadequate record is presented on appeal, on motion of a party or on its own motion the Appellate Division may remand the case to the Bureau for a further hearing and determination under Regulation 156B(3), or in its discretion, to the Law Division of the Superior Court for that purpose.

Regardless of what the future may bring in these matters, for purposes of the present case, we hold, for the reasons expressed above, that the Appellate Division erred in appraising the propriety of the tax assessment under the substantial evidence rule. Pursuit of the just result called for a *de novo* review, and since it was denied below we have

engaged in such a review. One of the preliminary factors involved in seeking proper perspective for an independent evaluation of the proofs is a decision as to which party must carry the burden of proof on the issue of Mrs. Lyon's domicil at the time of her death.

The basic and ultimate issue is the taxability of this estate and it seems just to say that the Bureau must bear the burden of establishing that status by a fair preponderance of the evidence. *Cairns v. Martin, supra,* 130 *N. J. Eq.* at 328; *Mellon Nat. Bank & Trust Co. v. Comm'r of Corps. & Taxation,* 327 *Mass.* 631, 100 *N. E.* 2d 370 (1951). However, in ·the framework of our case the obligation of going forward with the proof depends upon consideration of important intermediate issues and presumptions.

The major sub-issue is that of Mrs. Lyon's domicil. Her long time residence in Pompton Plains gave her a New Jersey domicil. Since in the eyes of the law no person is ever without a domicil, a presumption arose that she continued to be a domiciliary of this State until a new domicil was acquired. 25 *Am. Jur.* 2d, *Domicil, supra,* § 16, p. 13. Thus, her estate which claims that Maryland became her new domicil long before her death, became burdened with the duty of going forward with evidence to rebut the presumption and to show the physical assumption of a home in Maryland accompanied by an intention to acquire a new domicil in that State and to abandon the old one in New Jersey. *In re Fisher, supra,* 13 *N. J. Super.* at 53. Existence of certain factors of themselves serve to weaken the force of the presumption of continued domicil. For example, a home or residence in another state is commonly regarded as *prima facie* evidence of domicil, and the longer the period of the new residence the stronger the *prima facie* case becomes. It has been said also that proof of residence elsewhere is sufficient to rebut the presumption, and to return the onus of going forward with the proof that the former domicil has not been abandoned to the proponent of con-

tinuance. And the same concept has been put in another form : When a residence is taken up elsewhere, a presumption arises that the original residence has been abandoned. *Mitchell v. Delaware State Tax Comm'r.,* 49 *Del.* 598, 42 *A.* 2d 19 (Super. Ct. 1945) ; *Felker v. Henderson,* 78 *N. H.* 509, 102 *A.* 623 ; 25 *Am. Jur.* 2d, *Domicil, supra,* § 86, p. 62.

■ It is apparent that a variety of concepts exist in the law respecting proof obligations in cases of the type before us. For present purposes, since decision on the ultimate issue of taxability depends upon proof of domicil, and since the State holds the affirmative of the ultimate issue, it follows that the State must establish the status of taxability, *i. e.,* domicil by the preponderance of the credible evidence. This is not to say that the intermediate presumptions, described above are of no probative significance. They are of value in weighing the proof in its totality, and in the weighing process they must be laid upon the side of the scale of the party whose interests they favor.

■ Our independent evaluation of the record convinces us that the State did not show taxability. On the contrary, the conclusion that Mrs. Lyon's domicil was in Maryland at the time of her death clearly appears to have been revealed by the greater weight of the evidence. Here we have an 83 year old lady whose husband's death left her alone in their Pompton Plains home. Although not an invalid, she did have a heart condition and the physical infirmities associated with her age, and it was reasonable to believe that she could not remain alone in the house. Dr. Lyon, her only son and his wife and children, to whom she was greatly attached, resided in Baltimore and wanted her to live with them. Attractive physical accommodations had been prepared for her through an addition to the son's home, and his capacity as a physician provided additional security. The opportunity to take advantage of such an affectionate, comfortable and secure atmosphere would be likely in any case, and certainly in this one, to stimulate an affirmative response. It is difficult to think of a more natural tendency. On the proof

here, we regard as irresistible the conclusion that long before Mrs. Lyon died her intention to abandon her New Jersey home and to spend the rest of her life with her son in Baltimore, except for an annual visit to Pompton Plains to see any surviving friends and to visit her husband's grave, had come to full fruition. Under the circumstances she had acquired a domicil in Maryland, and upon her death her intangible personal property estate was not taxable in New Jersey. Accordingly, the judgment of the Appellate Division is reversed and the tax assessment thereon of the Bureau is set aside.

JACOBS, J. (dissenting) : The decedent Olive R. Lyon was born in New Jersey in 1882. She was married in New Jersey, maintained her marital home at Pompton Plains and lived there at least until 1965. After her husband's death in March 1965 she went to live at her son's home in Maryland but did not sever her New Jersey ties. Thus she at all times until her death continued to maintain her Pompton Plains home in good living condition, spent a month there during the latter part of 1965 and also spent a month there during 1966. She spent the summers of 1965 and 1966 at her son's home at the New Jersey shore. Her only bank accounts and her safe deposit boxes containing all of her corporate stocks were continued at all times in New Jersey and her ownership of New Jersey real estate parcels, in addition to her Pompton Plains home, were also continued. She died in a Maryland hospital on March 30, 1967. Her death certificate listed her "usual residence" as "721 Turnpike, Pompton Plains, New Jersey" and she was buried in Pompton Plains. Her 1953 will, which remained unaltered at the time of her death, was executed in New Jersey, recited her New Jersey home and named her son as beneficiary and executor.

Her executor claims that the decedent's admittedly long-standing domicil in New Jersey was terminated in favor of a Maryland domicil in 1965 when she went to live with him.

Under the cases he clearly has the burden of establishing such change of domicil. See *Texas v. Florida,* 306 *U. S.* 398, 427, 59 S. Ct. 563, 83 *L. Ed.* 817, 836 (1939); *In re Dorrance,* 115 *N. J. Eq.* 268, 274–275 *(Prerog. Ct.* 1934), *aff'd,* 13 *N. J. Misc.* 168 *(Sup. Ct.* 1935), *aff'd,* 116 *N. J. L.* 362 *(E. & A.),* cert. denied, 298 *U. S.* 678, 56 S. Ct. 949, 80, *L. Ed.* 1399 (1936); *In re Michelsohn,* 136 *N. J. Eq.* 387, 389 *(Prerog. Ct.* 1944); *Trust Co. of N. J. v. Spalding,* 125 *N. J. Eq.* 66, 70 *(Ch.* 1939); *Cromwell v. Neeld,* 15 *N. J. Super.* 296, 301 *(App. Div.* 1951). While the afore-cited cases did not specifically state that they meant to shift the ultimate burden of establishing domicil, I would so apply them at least in circumstances such as those presented here. See *Report, New Jersey Supreme Court Committee on Evidence* (March, 1963) at 49–50:

> There is the rather anachronistic dogma that "the burden of proof never shifts." But it is widely recognized that the burden of proof does shift, in many cases and for many reasons. In civil cases the allocation of burden of proof is determined by reasons of policy, fairness and convenience. Legislatures and courts have traditionally shifted the burden of proof by the use of such devices as presumptions and affirmative defenses. In some jurisdictions *res ipsa loquitur* shifts the burden of proof; in others it does not. In New Jersey our courts have not hesitated to shift the burden of proof where the situation seemed to warrant it. See, *e. g., Swain v. Neeld,* 28 N. J. 60, 145 A. 2d. 320 (1958).

See *In re Lundvall's Estate,* 242 *Iowa* 430, 46 *N. W. 2d* 535, 539 (1951); *cf. Psaty v. United States,* 442 *F. 2d* 1154, 1158–1161 (3 *Cir.* 1971).

In *Swain* this Court held that the statutory presumption with respect to gifts in contemplation of death not only shifted the burden of going forward with evidence but operated "to shift the burden of ultimate persuasion by a preponderance of the evidence from the State to the taxpayer." 28 *N. J.* at 64. In the course of his opinion Justice Burling pointed out that, as here, "[t]he salient facts to the inquiry are almost entirely in the possession of the taxpayer, and the witnesses are often interested parties"; and he noted

that the creation of the presumption "was in aid of achieving the policies of the contemplation of death provision which were to contain the evasion of inheritance taxes and promote equality of the incidence of the tax burden." 28 *N. J.* at 66. So here, the shifting of the burden of establishing a transfer of long-standing New Jersey domicil may serve towards containing some of the evasions which impose so unfairly on other New Jersey domiciliaries. Towards the same goal declarations of domicil motivated by tax considerations may be carefully scrutinized and readily rejected when negated by the objective circumstances. See *Texas v. Florida, supra,* 306 *U. S.* at 425, 59 S. Ct. at 576, 83 *L. Ed.* at 834–835:

> While one's statements may supply evidence of the intention requisite to establish domicile at a given place of residence, they cannot supply the fact of residence there; * * * and they are of slight weight when they conflict with the fact. * * * This is the more so where, as here, decedent's declarations are shown to have been inspired by the desire to establish a nominal residence for tax purposes, different from his actual residence in fact. * * * In such circumstances the actual fact as to the place of residence and decedent's real attitude and intention with respect to it as disclosed by his entire course of conduct are the controlling factors in ascertaining his domicile. * * * When one intends the facts to which the law attaches consequences, he must abide the consequences whether intended or not.

See *In re Benjamin's Estate,* 176 *Misc.* 518, 27 *N. Y. S. 2d* 948, 958 (*Sur. Ct.* 1941), *aff'd,* 263 *App. Div.* 981, 34 *N. Y. S. 2d* 394, *aff'd,* 289 *N. Y.* 554, 43 *N. E. 2d* 531 (1942); *Note,* "Self-Serving Declarations and Acts in Determination of Domicile," 34 *Geo. L. J.* 220 (1946); *Restatement (Second) Conflict of Laws* at 82 (1971).

The record before us contains no testimony at all in support of the claim by the executor. He relies instead on affidavits by himself and others friendly towards him. These affidavits consist largely of self-serving explanations and declarations which have never been subjected to cross-examination. I could not with any confidence rest any final

determination on them and would therefore remand the entire matter to the Transfer Inheritance Tax Bureau for a full trial-type hearing in conformity with its current regulations. *N. J. A. C.* 18:26–154–57 (1969). I see no justice in invoking at this juncture the discretionary appellate power of making an independent factual finding contrary to the administrative finding below. *Cf. D., L & W. R. Co. v. City of Hoboken,* 10 *N. J.* 418, 424–425 (1952).

I vote to reverse and remand.

*For reversal*: Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For reversal and remandment*: JACOBS—1.