In the Matter of the Estate of GLENN H. CURTISS, Deceased.

Surrogate's Court, Steuben County, May 7, 1931.

*William J. Maloney*, for the petitioner.

*Harold H. Corbin* and *Mark F. Hughes* [*Hornblower, Miller, Miller & Boston* of counsel], for the petitioner.

*Robbins & Robbins* [*Stephen A. Warren* of counsel], for Lena P. Curtiss, respondent.

*Albert W. Robbins*, special guardian for respondent Glenn G. Curtiss, Jr.

WHEELER, S. This is a proceeding for the probate of the last will and testament of Glenn H. Curtiss, deceased, the petitioner being the Herring-Curtiss Company, an alleged creditor. The answers of both the widow, Lena P. Curtiss, and the special guardian for the son, Glenn H. Curtiss, Jr., object to the jurisdiction of the court on the ground that decedent was not a resident of the county of Steuben, or the State of New York, at the time of his death, and set up as an affirmative defense that at the time of his death Mr. Curtiss was a resident of the State of Florida; that his will was executed there; and that prior to the commencement of this proceeding said will was duly admitted to probate in the State of Florida.

The decedent died at a hospital in the city of Buffalo, N. Y., July 23, 1930, leaving a will of real and personal property dated January 26, 1928, and witnessed by Francis M. Miller, Sue DuBose and B. F. Smith, whose residences are given in the will as Florida. The will also gave the residence of Mr. Curtiss as Country Club Estates, Fla. It was probated in the County Judge's Court of Dade county, Fla., on August 2, 1930. The present proceeding is for an original probate of the will in Steuben county, and was instituted on August 16, 1930, a duly exemplified copy of the will being filed in lieu of the original.

It is practically conceded by all of the parties that if Mr. Curtiss was in fact a resident of the State of Florida at the time of his death, and his will had been legally probated in that State, it cannot be proved in an independent or original probate proceeding in this State. Under such circumstances the surrogate upon proper application, accompanied by a copy of the will, and of the foreign letters properly authenticated, must record the will, and issue thereupon ancillary letters. (Surr. Ct. Act, § 159; *Matter of Connell*, 221 N. Y. 190.)

However, the petitioner does not concede the validity of the Florida probate, but on the contrary insists that the proceeding was not such a probate as should be recognized under the laws of this State, and in any event that it was in bad faith, and consequently urges this court to ignore that probate and treat it as a nullity.

The record relative to the Florida probate discloses that no notice was given to any one interested in the estate. Neither the widow nor the infant son of the decedent was within the State of Florida at the time, nor was there any authority to appear for the widow, or any one else, filed with the court. The American Exchange Irving Trust Company, named as one of the executors in the will, did not appear, and no notice of the application was given to it. No guardian, special or otherwise, was appointed to represent the infant. The petition was made by the attorney for the widow, who was named as an executor in the will.

In spite of the dissimilarity between the Florida procedure and probate as it is known in this State, it clearly appears from the Florida statutes and law introduced in evidence that wills may be probated there without notice, and that the probate was in all respects legal under the laws of that State. Admitting that this is true, the further question arises as to whether or not such foreign probate conducted without notice to any of the parties, and as above outlined, is to be recognized by the courts of this State. This must depend upon whether a proceeding to probate a will

is one which requires service of process upon all parties interested, or is one in the nature of a proceeding *in rem*, where such service may be dispensed with. It appears to be well established by the decisions of this State that the latter is the case, and if the Florida court otherwise had jurisdiction, it could make a decree admitting the will to probate, even though notice was dispensed with. (*Matter of Horton*, 217 N. Y. 363; *Vanderpoel* v. *Van Valkenburg*, 6 id. 190; *Monroe* v. *Douglass*, 4 Sandf. Ch. 126; affd., 5 N. Y. 447.)

The petitioner has further challenged the Florida probate on the grounds that the proceedings there were in bad faith. The court cannot agree with this contention, and must hold that the claim of bad faith is immaterial in law, and without foundation in fact. It has been settled in a long line of cases that acts otherwise lawful, and within a party's rights, cannot be made unlawful by a bad motive, or a desire to injure another. (*Auburn, etc., Co.* v. *Douglass*, 9 N. Y. 444, and cases collated; *Phelps* v. *Nowlen*, 72 id. 39.) And this rule applies to taking legal proceedings, or the enforcement of legal remedies. (*Carroll* v. *Greenburg*, 216 App. Div. 268; affd., 244 N. Y. 543; *Matter of Hirshfield* v. *Craig*, 209 App. Div. 555; *Dalurey* v. *Rezinas*, 183 id. 456; affd., 229 N. Y. 513.)

The subject of the will was discussed between Mrs. Curtiss and Mr. Miller, the Florida attorney who had prepared the will, at Hammondsport on July twenty-sixth, the day following the funeral. Mrs. Curtiss was informed that the will was in Curtiss' safe at Country Club Estates, Fla., where it was subsequently found. Arrangements were made for the probate of the will on August second. Miller did not leave New York for Florida until July thirty-first, arriving in Florida August second, and probating the will on that date. Such circumstances are not at all unusual, and do not indicate a hurried probate, or bad faith.

The foregoing conclusions are based, of course, upon the assumption that Curtiss was an actual resident of the State of Florida.

On the contrary, if we are to assume that the decedent was a resident of the State of New York, then we must take an entirely different view concerning the legal effect of the Florida probate. It is settled law that an *ex parte* adjudication upon the domicile of a decedent made in a probate proceeding has no probative force outside the State in which it is made, and is not conclusive on the courts of another State under the full faith and credit clause of the Federal Constitution. (*Overby* v. *Gordon*, 177 U. S. 214; *Thorman* v. *Frame*, 176 id. 350; *Matter of Horton*, 217 N. Y. 363; *Mast, Foos & Co.* v. *Stover Mfg. Co.*, 177 U. S. 487.) Therefore, it must be held that the Florida probate constitutes no valid objection to the probate of the will upon a duly exemplified copy thereof in

this State, providing the court is convinced that decedent died a resident of this State.

Thus we arrive at the paramount question in this proceeding: Was Glenn H. Curtiss a resident of Steuben county, N. Y., at the time of his death?

As bearing upon this question a most remarkable and voluminous record has been presented. The evidence, including both oral and documentary, fairly portrays the history of Mr. Curtiss' life, his activities and interests. It appears that extraordinary efforts have been made to produce every act, writing and declaration, formal or informal, bearing upon the all-important question of residence.

While it is not the purpose of this court to make an exhaustive review of the law relating to residence and domicile, nevertheless. a reference to some of the elemental principles governing the subject will facilitate this inquiry.

We are here concerned with the question of " domicile," as distinguished from " residence." That there is a distinct difference in meaning between the two is shown by the fact that a person may have his residence in one place while his domicile is in another. Thus it must be observed that domicile and residence are not synonymous for the reason that a person may have more than one residence, but cannot have two domiciles. (10 Am. & Eng. Ency. of Law, 8.) Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home.

The existing domicile of a person, whether of origin or selection, continues until a new one is acquired, and the burden of proof rests upon the party who alleges a change. In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence, is of no avail. A mere change of residence, although continued for a long time, does not effect a change of domicile, while a change of residence, even for a short time, with intention in good faith to change the domicile, has that effect. A change of domicile may be made through caprice, whim or fancy, for business, health or pleasure, to secure a change of climate, or a change of laws, or any reason whatsoever, providing there is an absolute and fixed intention to abandon one, and acquire another, and the acts of the person affected confirm the intention. No pretense or deception can be practiced for the intention must be honest, the action genuine, and the evidence to establish both clear and convincing. (*Matter of Newcomb*, 192 N. Y. 238; *Dupuy* v. *Wurtz*, 53 id. 556.)

The foregoing discussion shows what an important and essential bearing intention has upon domicile. The question is one of fact

rather than law, and every case must stand upon its own peculiar circumstances.

Glenn H. Curtiss was born at Hammondsport, N. Y., in 1878, that village having been the ancestral home of the Curtiss family for at least two generations preceding his birth. When about seventeen years of age he went into business there, and was first engaged in repairing bicycles, and later on, and by the year 1908, he had started to manufacture motorcycles, and finally he built and manufactured aeroplanes, and was destined to become one of the outstanding men of his time in the development of aeronautics. His factory from the beginning was located on the hill at Hammondsport in the immediate vicinity of the house where he had lived from the time he was a boy, and where he continued to live until the family moved to Buffalo in 1915. From 1910 to 1915 Mr. and Mrs. Curtiss spent the winter months in California, his business in connection with the development of the hydro-aeroplane requiring his presence there. He built two houses in California, one of some seven or eight rooms for his family, and the other a small bungalow for his mother. There is no claim made that he made any attempt to change his domicile to California during that period.

During the war the aeroplane business expanded rapidly, and the Curtiss Company branched out and built a factory at Buffalo, N. Y. In 1915 Curtiss and his family moved from Hammondsport to Buffalo, where they resided in an apartment hotel until 1917, in the fall of which year they moved to Garden City, N. Y., and lived there until they took up their residence in Hialeah, Fla., in the fall of 1923. During this latter period — 1915 to 1923 — they continued to own the house on the hill at Hammondsport, the title being in the name of Mrs. Curtiss, but they did not live there and returned only for occasional visits. During a part of this period of time the house was rented and used as a club.

On November 15, 1923, the Curtiss family moved into the Hialeah house at Hialeah, Fla. In February, 1926, they moved into the palatial new home they had built at Country Club Estates, Fla., and continued to live there until his death, although spending a part of the summers in the house on the hill in Hammondsport, particularly the summers of 1927, 1928, 1929 and 1930. A vast amount of evidence has been introduced relating to the time Curtiss spent in Florida, and in Hammondsport during the last few years of his life. Concededly, the winters from 1923 on were spent in Florida. Curtiss was rarely seen in Hammondsport until the summer of 1927, Mrs. Curtiss testifying that prior to 1926 she was in Hammondsport each summer three days to a week

only.  Mrs. Curtiss came to Hammondsport in May or June, 1927, returning some time in the fall.  From July to November, 1928, the family was in Hammondsport, also in 1929 from June to November.  In 1930 Curtiss and his family came north in the latter part of May, at which time he made his flight down the Hudson, returning to Florida the next day.  During these last three or four summers, Curtiss himself was back and forth from Florida to Hammondsport, spending a part of the time in Florida and part of the time in Hammondsport.  In this connection it must be noted that a very important litigation brought by the Herring-Curtiss Company against Curtiss had been pending in the courts of this State for many years prior to his death.  The record shows very clearly that the great majority of his trips north during the last three years of his life were necessary in connection with this litigation.  In fact he was stricken with his fatal illness while *en route* from Hammondsport to Rochester to attend a hearing in this case.

During the summers Curtiss engaged in certain experimental work in the old plant in Hammondsport, one experimental car was made there and eight men were employed there when he died. There is proof that this work was carried on in the summers at Hammondsport largely because he was north on account of the Herring-Curtiss suit, and he wanted something to do while there.

The fact that Curtiss retained his legal residence or domicile in Hammondsport until 1918 is not disputed, indeed that place may be properly termed his domicile of origin.  Considerable evidence has been produced on the subject of his legal residence or domicile from 1918 to 1923, during the years he lived in Garden City.  He owned the house where he resided in Garden City.  He declared as a witness in the Herring-Curtiss case in 1922 that his residence was Garden City, N. Y.  He executed two very important trust agreements wherein he stated that he was a resident of Garden City.  In one of his letters it appears that he voted as a resident of Garden City.  The evidence is very convincing that he gave up his domicile of origin in Hammondsport, and transferred it to Garden City before moving to Florida, in about the year 1923.  Prior to 1923 he had disposed of his holdings in the Curtiss· Aeroplane and Motor Company, and had no active business interests in the State of New York.

From the fall of 1923 to the time of his death, his Florida interests were developed on a vast scale, and were a multitude in number.  His home at Country Club Estates was built in accordance with his own and Mrs. Curtiss' personal tastes and desires, and at a cost of $150,000, the furnishings costing an additional

$80,000. The Country Club Estates residence is in decided contrast to the old house on the hill at Hammondsport, which is assessed at $1,500, and is situated in close proximity to the partially abandoned factories. The proof is that while the Hammondsport house was kept in a fair state of repair, nevertheless it was old, and a very ordinary wood frame house. Mrs. Curtiss claimed that it was not suitable for the family, and objected to occupying it during the last few summers. An attempt was made to rent a cottage on the lake near Hammondsport, but without success. Obviously, there could be no real comparison between this house and the pretentious establishment in Country Club Estates.

From 1923 on his entire family, including his mother and brother, lived in Florida, both his mother and brother owning substantial houses situated near the Curtiss residence. His son was being educated there. He organized and controlled some eighteen Florida corporations. Including his home, his actions, and course of conduct as related in the preceding discussion, the record contains evidence as to his more formal acts, which have an important bearing on the question of domicile. The will itself gives his residence as Country Club Estates, Fla. A will is a solemn document of a sacred character, and its declarations carry great weight. Surrogate O'Brien very recently (*Matter of Garavis*, 139 Misc. 477), in commenting on the declarations in a will as to residence, states: " It [the testimony] was altogether too meager and too weak to outweigh the effect of the declaration made by the testator in the will. * * * This statement is too solemn and too serious to permit of any deduction that it was cursory or a matter of routine or merely descriptive or without special significance."

At least six times he was required to state under oath what his legal residence was. On the trial of the Herring-Curtiss case in 1922 he swore he was a resident of Garden City. In 1926 he submitted a sworn statement to the New York State Tax Commission setting forth that he had changed his residence to Florida in 1923. This statement was submitted on an application for refund of his New York State income tax for the years 1923 and 1924, and is in part as follows: " Deponent erected a house in Hialeah, Florida, and with the intention of making the said State his legal residence, moved his family there, and since November 15, 1923, deponent's legal residence has been in the State of Florida. Prior to establishing said residence in Florida, deponent was a resident of the State of New York, living at 111 Stewart Avenue, Garden City, Long Island. Deponent was the owner of said premises up to September 10, 1926, but has not occupied the same,

nor any other place in the State of New York since 1923, except for a period of a few weeks in each of the summers of 1924 and 1925, no periods in either year exceeding six weeks." Curtiss was also examined personally in detail and under oath in that proceeding, and a determination was made therein by the Commission to the effect that Curtiss was a legal resident of Florida.

On June 20, 1927, we have his sworn statement in a passport application that his residence and domicile were in Florida. In three applications for patents he swore that his residence was in Florida. Furthermore, there is in evidence a large number of legal instruments of various kinds, all reciting his residence as Garden City, while he lived there, and as Hialeah and Country Club Estates while he lived in those places.

Of all the formal acts to be scrutinized in ascertaining a person's domicile, undoubtedly the act of registering and voting is the most important, and while not necessarily conclusive, it is usually most convincing and persuasive. It has been held that the act of voting is a distinct, unequivocal and public assertion by the voter of his legal domicile. (*Cooper's Administrators* v. *Commonwealth*, 121 Va. 338; *People ex rel. Beers* v. *Feitner*, 40 Misc. 368; *Hammond* v. *Hammond*, 103 App. Div. 437; *Lewis* v. *Beach*, 112 N. Y. Supp. 200; *Libbey* v. *Mason*, 42 Hun, 470.) The evidence shows that Curtiss voted at Country Club Estates in a municipal election in 1926; he had registered and paid his poll tax, and under the Florida statutes was qualified to vote. He voted again in a town election on April 1, 1930, having registered in 1928 and 1929, taking an oath containing a statement that he had been a resident of Florida for at least twelve months, and that he was qualified to vote in the State of Florida. The poll tax receipts in evidence show that he paid his Florida poll taxes from 1924 to 1929, inclusive.

In 1929 the Governor of Florida appointed Mr. Curtiss as a member of the "Board of Commissioners of the Okeechobee Flood Control District." This Board consisted of five members who under the laws of Florida were required to be landowners and residents of counties lying wholly or partially in the district. (Florida Laws of 1929, chap. 13711.) The fact that Curtiss held this high public office during the last year of his life is of great force. As far as the records reveal, Mr. Curtiss never executed a legal instrument, or performed a legal act after 1918, in which he stated his residence was Hammondsport.

In considering Mr. Curtiss' informal declarations, both oral and written, we are confronted with certain doubts and apparent inconsistencies. For instance, great stress is made by the petitioner on statements contained in a letter written by Curtiss in 1928 to a

newspaper reporter living in Buffalo, named Burrill. The occasion for this letter was the publication of a laudatory biographical sketch in which the author stated that Curtiss had left Hammondsport over a dozen years before. In this letter Curtiss wrote: " I want to correct the impression that I ever left Hammondsport permanently, or that I have lost interest in western New York. As a matter of fact right now there is a move on foot for the establishment of a state airport. I wish you would get in touch with Ladd Seely at Hammondsport. Maybe you could help the cause along. It would be a good thing for the Lake region, and I am sure the community and myself would appreciate anything which could be done to bring about the success of the venture." In order to properly interpret the meaning of this letter, it is necessary to understand the accompanying circumstances. As indicated in the letter, movement was on foot to establish a commemorative airport at Hammondsport in honor of Curtiss. Unquestionably he was interested in the project, and in fact had aided it financially. The Burrill article gave the impression that Curtiss had deserted his native village. Undoubtedly he knew, or believed, that publicity of this character would injure the project, and it is entirely probable that he wrote the letter solely in the interests of the airport, and with the idea of convincing Burrill that he had not forgotten Hammondsport, and was interested in the town, not that he was a legal resident of it.

At a celebration held in Hammondsport in 1928 in honor of Curtiss, he was asked: " When are you going to move back to this country, Mr. Curtiss? Well [said Curtiss] I never really moved away." This statement is understandable when it is noted that the occasion was to honor Curtiss, and to boost the airport project, It would only be natural for him to thus show his interest. It is true that the family had always retained the old house on the hill. so that the statement had some basis of fact, but it did not indicate that he retained his legal residence there. In any event, whatever probative force these statements may possess is weakened by the fact that he subsequently performed all the acts as a citizen and legal resident of Florida.

The petitioner claims much on account of the resident hunting license obtained by Curtiss in Hammondsport in October, 1929. However, the value of this evidence is destroyed by the fact that he obtained a similar hunting license in Florida in September, 1929, and that in November, 1929, he took the oath above referred to, and registered as a legal resident of Florida.

It is further insisted by the petitioner that the death certificate

which gave Curtiss' residence as Hammondsport is made *prima facie* evidence of the facts therein stated under section 391 of the Public Health Law (as amd. by Laws of 1925, chap. 367). This death certificate, of course, made by a third party after his death, without the knowledge or consent of his legal representatives or next of kin, can have but little weight. Under the decisions of this State the statute is only designed for public purposes, and does not apply in cases of private controversies between adverse parties. (*Beglin* v. *Met. Life Insurance Co.*, 173 N. Y. 374; *McCafferty* v. *City of Salamanca*, 171 App. Div. 889.)

Counsel on both sides have shown great industry in obtaining hotel registrations from different parts of the country. These registrations are conflicting. Generally when in the north he gave his address as Hammondsport, N. Y., and when in the southern hotels he registered as from Country Club Estates, or Miami. It cannot be doubted that he had the right to register either from his domicile, or from his temporary place of abode. (*Chambers* v. *Prince*, 75 Fed. 176.) Such conflicting hotel registrations, while entirely competent as evidence, have but little significance in determining the question of domicile.

The record contains evidence of numerous other declarations introduced from many sources by the respondents, which strongly fortify their contention. The evidence of C. M. Keys, the New York broker who had handled investments for Curtiss since 1916, is highly important. He testifies that Curtiss refused to come in on the purchase of the stock of the Curtiss Aeroplane and Motor Corporation by Keys because " He was getting out of aviation, and getting more interested in real estate, and because he was going to live in Florida, and would not be around in the north much." Later the question of Curtiss' legal residence came up for discussion between Curtiss and Keys, and Curtiss told the witness that his legal residence was Florida. The witness Leaycraft, who was associated with Curtiss from 1918 to 1928, relates important declarations of Curtiss showing that his legal residence was in Florida after the fall of 1923. He refers to the New York State income tax proceedings, and states that after compromising the tax matters for 1923 and 1924, no further income taxes were paid to New York State, and that the Federal income tax returns for 1924 and for the years thereafter were filed from Florida. Likewise, the evidence of Mrs. Curtiss is important as well as convincing, as she testifies to several conversations with her husband in which he declared that Florida was his legal residence.

These conflicting declarations afford another illustration of the

weakness of declarations as against what may be called the acts of the decedent, going to make up the manner and conduct of his life. Following the statement of the rule in the leading case of *Dupuy* v. *Wurtz* (53 N. Y. 556) the courts of this State have repeatedly disregarded declarations when they conflict with acts which are more persuasive in showing intent. (*Matter of Harkness*, 183 App. Div. 396.)

In reviewing at length the evidence offered in this case, both oral and written declarations, it is found that in every formal act of his life since 1923, where it became necessary for him to state his domicile, he invariably claimed it as the State of Florida, and not the State of New York. Any of these recited acts or declarations standing alone may be of slight importance, none are conclusive, but grouped together they create the highest evidence of unequivocal acts, conclusively proving an intent on the part of Mr. Curtiss to make Florida his domicile of choice. It is, therefore, held that Glenn H. Curtiss was not at the time of his death domiciled in the State of New York.

For the reasons herein stated, and in accordance with the rulings made, the court holds that the petition for the probate of the last will and testament of the testator should be denied.

Enter decree accordingly.