CITIZENS BANK AND TRUST COMPANY, *ET AL.*, APPEL-
LANTS, v. SIDNEY GLASER, DIRECTOR, DIVISION OF
TAXATION, RESPONDENT.

Argued February 9, 1976—Decided April 8, 1976.

*Mr. Vincent D. Manahan III* and *Mr. G. H. Gilliam* (of the Virginia Bar, admitted *pro hac vice*) argued the cause for appellants (*Messrs. Herrigel, Bolan & Manahan,* attorneys).

*Mr. Michael E. Goldman,* Deputy Attorney General, argued the cause for respondent (*Mr. Stephen Skillman,* Assistant Attorney General, of counsel, and *Mr. William F. Hyland,* Attorney General, attorney).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. This appeal presents the question of the correctness of the determination by the respondent, affirmed by the Appellate Division, that Inez Duff Bishop died domiciled in New Jersey, thereby subjecting her intangible personal property to the New Jersey Transfer Inheritance Tax. Appellants contend domicile at death was in Virginia.

Mrs. Bishop, a widow, died April 13, 1966. In December 1966 the executors of the estate filed an inheritance tax return in New Jersey and paid a tax of about $100,000 on an estate of approximately $1,750,000. About $13,000 was refunded. Subsequently the executors protested the payment, supporting their position with affidavits and depositions to sustain the claim of Virginia domicile. The protest was rejected by the tax bureau December 4, 1972. An appeal by the estate to the Appellate Division was stayed in order to allow reconsideration and the making of adequate findings of fact by the bureau conformable with our recommendations in *Lyon v. Glaser,* 60 *N. J.* 259, 273–276 (1972).

A hearing was thereafter held before Robert R. Ross, a hearing officer for the bureau. The hearing was primarily on documents and depositions, with little oral testimony. In a thoroughly considered opinion fully analyzing the material facts and the law the hearing officer arrived at the conclusion that Mrs. Bishop had changed her domicile from

New Jersey to Virginia after 1933 and that the applicable estate was therefore not taxable here.

The respondent Director of the Division of Taxation rejected the hearing officer's findings and conclusions and found decedent to have died domiciled in New Jersey. He relied solely on the following facts: (a) she voted in New Jersey from time to time between 1943 and 1964; (b) she filed her federal tax returns giving New Jersey as her residence; (c) she never paid Virginia state income taxes.

The Appellate Division affirmed in an opinion concluding there was "ample evidence in the record to justify the Director's determination * * *". The court was "loath" to find, as did the hearing officer, that a woman like Mrs. Bishop would continue indicia of New Jersey residence (voting and paying federal taxes from New Jersey) just to avoid payment of the Virginia income tax.

██ Since the only administrative appraisal of the material facts in a quasi-judicial manner in the Division of Taxation (see *Lyon v. Glaser, supra,* 60 *N. J.* at 273) is that set forth in the hearing officer's report, and as we regard it as an accurate reflection of most of the material proofs, we set forth the factual recitals of that document.

The salient facts in this case are not in dispute with respect to the submitted evidence of the material events in the life of the decedent. The following sequence and pattern of germane activity is narrated as being fairly drawn from the evidence presented.

Inez Duff Bishop was born Inez Duff in the State of Virginia in 1875. In 1917 when she was in her early forties, Miss Duff left Virginia to attend nursing school in New York City. In the same year she met and married Arthur Bishop, a man of extensive wealth, and moved with him into his home in New Brunswick, New Jersey. Mrs. Bishop and her husband also owned and maintained a summer home in Beach Haven, New Jersey. With these two residences in operation, the couple obviously resided and were domiciled in the State of New Jersey from the time of her marriage until Arthur Bishop died in 1933. He was buried in New Brunswick. As herein before indicated, Mr. Bishop left his widow a considerable dollar amount of assets.

The New Brunswick home that the decedent and her husband had occupied apparently reverted to Mr. Bishop's first wife upon his

demise. To fulfill what she considered was her husband's desire, Inez Duff Bishop subsequently purchased the house from her deceased husband's first wife and donated it to the Elks, one of the deceased Mr. Bishop's favorite lifetime interests. Mrs. Bishop sold the other home that she and her husband had formerly occupied in Beach Haven, New Jersey but contemporaneously apparently built another home in Beach Haven, New Jersey a few doors away from their former home. This newly built Beach Haven home was a two story residence with central heating and other then modern facilities.

Inez Duff Bishop continued to spend a few months of the summer season annually in Beach Haven, New Jersey until a year or possibly two before her death when she had apparently become too ill to travel from Virginia to New Jersey. In 1933 Mrs. Bishop had purchased a home in Charlottesville, Virginia where she appears to have spent at least sixty percent of her time annually. However, in 1943 Inez Duff Bishop had registered to vote in New Jersey and she last voted in New Jersey, by absentee ballot, two years before her death. Mrs. Bishop, after her husband's death, seems to have placed her financial affairs in the trust of her brother, Ernest Duff, who resided in Charlottesville, Virginia. It is conceded that she maintained a residence (at least in the lay sense) in Charlottesville, Virginia until her death. Her brother took over her business affairs and had legal power of attorney over her affairs for several years prior to her death.

There is some evidence that Mrs. Bishop was a somewhat strong willed, active person when she was physically healthy and that she did play some part in the decision making processes. Mr. Duff, the brother, filed the decedent's income tax returns as attorney-in-fact. Her federal income tax returns were filed with a listing of the Beach Haven, New Jersey home as her address. Albeit, the State of Virginia during the years involved imposed an income tax on Virginia domiciliaries, no Virginia income tax returns were ever filed by the decedent. The evidence reveals that on one occasion Mrs. Bishop's accountant prepared the federal income tax return 1040 listing the Charlottesville, Virginia address as the legal residence. Mr. Duff rejected these returns, refused to execute them and ordered the accountant to redraft the returns with a listing of the Beach Haven, New Jersey address.* The interesting rationale behind this event and the attitude established can be found in the deposition of Emma Ruth Duff, the wife of Ernest Duff (now deceased), sister-in-law of the decedent. On Page 7, the following sequence appears:

Q Is Beach Haven a summer type seaside resort?

A Yes, it was entirely.

---

*See the footnote on page 79, *infra*.

Q And what was Mrs. Bishop's purpose in coming here?
A For a summer home.
Q Why didn't she stay in Charlottesville?
A Am I supposed to tell the truth?
Q Yes. Why didn't she stay in Charlottesville in the summer?
A Because she wanted to evade the state income tax.
Q Why did she pick Beach Haven?
A Well, she knew through her husband that there was no state income tax in New Jersey.

There is overwhelming evidence that when physically able Mrs. Bishop was active in Charlottesville affairs and obviously had most of her financial dealings and social connections in that City, as well as, favoring that area with her charitable inclinations. It is indicated that Mrs. Bishop spent at least the extended spring and fall season of every year in Charlottesville, Virginia, a few summer months in Beach Haven, New Jersey and then also found time to spend the cold months of the winter at a home she had acquired in Florida. This latter home was disposed of a few years prior to her demise.

Considerable testimony was presented with respect to the character of the furnishings in the two residences with an attempt made by the estate to indicate a sparce, "ratty" type of furnishing for the Beach Haven home and a somewhat superior character of the furnishings in the Charlottesville home. There is an indication that Mrs. Bishop was not furniture conscious and that her furnishings generally were far less desirable than what her financial status would have allowed in all three of her homes. There seems to be very little doubt as to Mrs. Bishop's concentration of her financial interests in the Charlottesville, Virginia area. She invested heavily in a Charlottesville Bank, the Citizens Bank & Trust Company. At the time of her death she was the largest stockholder in this Bank with an investment valued at about $270,000. There seems to be very little question that she relied heavily on her brother who lived next door in Charlottesville. She appeared to have given Ernest R. Duff almost complete control of her finances.

An objective analysis of the presented facts which bear on the issue of domicile leads one to the proposition that after her husband's death, Inez Duff Bishop shifted her financial/social headquarters and daily living center to the Charlottesville, Virginia area from which she had originally come. At the same time she, no doubt with the extreme pressure of her brother so dictating, strove to put herself in an appearance position of not abandoning her New Jersey domicile. There can be no question that up until the time her husband died in 1933, Mrs. Bishop was domiciled in the State of New Jersey.

\*       \*       \*       \*       \*       \*       \*       \*

Inez Duff Bishop assumed a home in Virginia and apparently headquartered her life in Virginia but had a mental reservation for tax purposes, to retain her New Jersey domicile. The controlling facts

seem to settle in the *Lyon* mold, conceding that unlike the *Lyon* situation, where the decedent made no attempt to retain her New Jersey residence and domicile, Mrs. Bishop, though it be for tax motives and upon the advice and direction of her brother, endeavored in every window dressing manner possible to lift herself up by her own bootstraps legally, in the attempted retention of New Jersey, as her legal domicile. The conclusion is inescapable that this was done primarily to evade Virginia State Income Tax and it is conceivable there may have been other tax avoidance motives involved at the time.

\* \* \* \* \* \* \* \*

\* \* \* The representatives of the estate did come forward with convincing evidence that Mrs. Bishop acquired a home in Charlottesville, Virginia, renewed former contacts in that area and began conducting the preponderance of her life activities from Charlottesville, Virginia and if one were to weigh the issue of domicile, based on actual time spent in a given state with respect to day to day living activities, there appears to be very little to dispute a conclusion that time spent arithmetically calculated, would clearly demonstrate that most of her time in her later years was spent in the Charlottesville area and in that home. Her will beneficiaries were mainly in that locale. The overwhelming quantum of hub facts in her last 33 years of life appear to be in that Virginia area.

The foregoing findings concerning the tax avoidance factor gain added illumination from the testimony on depositions of the Charlottesville accountant who prepared decedent's federal tax returns from 1939 on (in 1934 and 1935 the returns gave a Charlottesville address). He never met Mrs. Bishop, having been engaged by Mr. Duff. Although he felt the returns should be filed under the Charlottesville address, he specified the Beach Haven address on the instructions of Mr. Duff who told him the purpose was to avoid Virginia income taxes. The accountant believed Mrs. Bishop should file a Virginia state income tax return and actually prepared one on one occasion, but Mr. Duff refused to permit it to be filed.\*

---

\*The hearing officer apparently confused this incident with the one related in his findings concerning the preparation of a federal return with a Virginia address which Mr. Duff supposedly refused to sign. The accountant's deposition does not indicate such an episode. The fact-findings by the hearing officer are otherwise accurate.

■ A preliminary procedural question requires attention in view of our decision in *Lyon v. Glaser, supra.* We there held that where the tax bureau in the Division of Taxation follows the theretofore traditional method in the bureau of determining a contested question of domicile by a mere review of documents and affidavits, without a formal hearing and with a conclusional determination, judicial review thereof in the Appellate Division must be by a reconsideration of the facts *de novo* rather than by the "substantial evidence" rule ordinarily applicable in review of determinations of administrative agencies. (60 *N. J.* at 274–275).

■ In the present case the orginal bureau determination of taxability in New Jersey was made prior to the decision in *Lyon, supra.* Thereafter, as noted above, a hearing was arranged before a hearing officer. A hearing in accordance with the *Lyon* prescription, *i. e.,* with substantial oral proofs, cross-examination, etc. was not conducted, but the determination by the hearer was not, as is evident from the quoted excerpts, merely conclusional, but fully analytical, and attended by findings as to basic or operative facts as well as ultimate or conclusional ones. It thus appears that the *Lyon* prerequisites for employment of the substantial evidence rule in the reviewing court were only partly, not fully complied with here. The determination on review by the Appellate Division does not advert to the *Lyon* rule, but it is evident that the court, in effect, applied the substantial evidence rule, not that for a *de novo* independent fact evaluation.

We resolve the dilemma thus presented by our conviction that the determination of taxability in New Jersey must be set aside whichever the appropriate rule of judicial review. We do not find substantial credible evidence in the record as a whole to support a finding that the decedent died domiciled in New Jersey. *A fortiori,* our independent evaluation of the facts leads to the conclusion of Virginia domicile at death.

The controlling rule was restated in the *Lyon* case (60 *N. J.* at 264):

Domicil is very much a matter of the mind — of intention. One may be acquired, or changed to a new one, when there is a concurrence of certain elements; *i. e.*, an actual and physical taking up of an abode in a particular State, accompanied by an intention to make his home there permanently or at least indefinitely, and to abandon his old domicil.

■ Where there are multiple residences, as here, domicile is that place which the subject regards ·as his true and permanent home. *In re Dorrance*, 115 *N. J. Eq.* 268, 274–275 (Prerog. Ct. 1934), aff'd 13 *N. J. Misc.* 168, 176 *A.* 902 (Sup. Ct. 1935), aff'd 116 *N. J. L.* 362 (E. & A. 1936); *cert.* den. 298 *U. S.* ·678, 56 *S. Ct.* 949, 80 *L. Ed.* 1399 (1936), reh. den. 298 *U. S.* 692, 56 *S. Ct.* 957, 80 *L. Ed.* 1410 (1936). An authoritative definition of a "home" for this purpose is that set forth in *Restatement,* 2d, Conflict of Laws (1971), § 12:

Home is the place where a person dwells and which is the center of his domestic, social and civil life.

See also *O'Hara v. Glaser,* 60 *N. J.* 239, 248 (1972).
■■ While it is the burden of the State to show taxability of the estate in New Jersey by a preponderance of the evidence, *Lyon v. Glaser, supra* (60 *N. J.* at 277), yet the establishment of decedent's initial domicile in New Jersey (New Brunswick) created a procedural presumption of domicile in New Jersey and placed the burden upon the estate of coming forward with evidence to show an intention to acquire a new domicile in Virginia. *Id.* at 277. If *prima facie* proof to that effect was presented the ultimate burden of persuasion on the issue continued with the party asserting that domicile remained at the original place — here the respondent. *Id.* at 277–278.
■ The evidence here clearly establishes a *prima facie* case of removal of domicile from New Jersey to Virginia after the death of decedent's husband. The recital of the proofs in the report of the hearing officer, amply justified by the evidence, is strongly persuasive that Charlottesville

became after 1933 "the center of [decedent's] domestic, social and civil life" and continued as such until her death. The Beach Haven residence had been only a summer home (in an ocean resort community) when decedent was married and lived in New Brunswick, and it remained such after her husband died and she moved to Virginia. The State's case for refutation of the *prima facie* showing made by the estate rests on the bare facts of voting in and paying federal income taxes from the New Jersey address. But there is direct and cogent proof supporting the inference that these acts were deliberate tactics to lay a basis for avoidance of the Virginia state income tax. The hearing officer so found, and the respondent did not overrule that express finding.

We may observe, moreover, that even if the tax motive thus indicated were not supportable, the overwhelming proportion of the indicia as to what the decedent regarded as her real, principal and permanent home after 1933 as well as the central fulcrum of her life must here be found to converge in and around the Charlottesville locale. There she lived most of the time; there were all her relatives and friends; there were her physician, her lawyer and her brother, who was also her closest relative and business advisor; there was her principal investment and commercial interest (the bank); there were her main place of worship, objects of charitable beneficence and her community interests; and there she died and was buried nearby, proclaiming herself in her 1963 will as "now of Charlottesville."

The only tenable holding on this record is that Mrs. Bishop died domiciled in Virginia, not New Jersey. This determination renders it unnecessary to pass upon appellants' alternative contention that since a Virginia court of record has declared decedent a domiciliary of Virginia, causing the estate to be subject to taxation in that state, imposition of a New Jersey tax on all the intangible personal property assets of the estate, most of which are not situate here, would constitute a denial of due process.

The judgment of the Appellate Division is reversed and the tax on intangible personal property is set aside.

SCHREIBER, J. (dissenting). Unfortunately the majority has seen fit to accept the findings of fact and conclusions of one hearing examiner and reject those of the Director of the Division of Taxation. Unfortunately because to adopt the examiner's findings misconceives the reviewing role by which we should abide. Undue weight is accorded the examiner's conclusions, particularly since of the five witnesses who testified, he heard only one whose testimony was perfunctory. In addition, a substantial part of the record relied upon by the examiner, admitted into evidence over the State's objection was not competent. The Director of the Division could and did reasonably reach different conclusions on the basis of this record.

The majority is ambivalent on the proper scope of judicial review. It holds that a trial type hearing had not been held by the Division of Taxation.[1] Yet, the record clearly demonstrates that it had. The testimony of Emma Duff, William Trevillian, Richard Hantzman and Jane Shields had been taken in August 1970.[2] The executors of the estate had also submitted numerous affidavits. The examiner who heard the testimony of these witnesses and examined the affidavits found that Mrs. Bishop's estate was subject to the New Jersey Inheritance Tax. This finding was confirmed by the Director and the executors filed a notice of appeal to the Appellate Division. While this appeal was

[1]All proceedings are before the Transfer Inheritance Tax Bureau which is a part of the Division of Taxation.

[2]Duff was Mrs. Bishop's sister-in-law, co-executor of the estate, co-trustee of a testamentary trust, a beneficiary under the will. Trevillian was president of the Citizens Bank & Trust Co., the executor, co-trustee of a testamentary trust, and a beneficiary under the will. Hantzman was the accountant retained by the executor. Shields was an employee of the Citizens Bank & Trust Co. Her family had benefitted from Mrs. Bishop's generosity.

pending, both parties sought and obtained a stay of the appeal, apparently because of our decision in *Lyon v. Glaser,* 60 *N. J.* 259 (1972), so that the matter could be remanded to the Division. On remand a second trial examiner heard the matter.

At the opening he said:

Gentlemen, in compliance with the procedures calling for a trial type hearing, we have set this hearing this afternoon. There have been at least two other sessions, I would think, that would qualify, in the broad sense, as trial type sessions: Depositions and oral examinations taken on August 25th in this matter and, in addition, a Deposition taken on August 19th, both 1970, in which cross-examination and so forth took place. It's my opinion that that would qualify as trial type hearings.

This meeting today is for the purpose of concluding the trial type hearing portion of our matter in this case.

Both parties agreed with the examiner's comments. The attorney for the Executors, other than introducing some affidavits and producing one witness who testified to his correspondence after Mrs. Bishop's death with certain companies whose securities she owned, relied upon the testimony adduced at the prior hearings. Under these circumstances we are satisfied that hearings in compliance with the Administrative Procedure Act were held. *N. J. S. A.* 52:14B–9; *compare, Lyon v. Glaser, supra.* Neither of the parties has argued otherwise on this appeal and the Appellate Division implicitly reached the same conclusion.[3]

The Appellate Division was called upon to review the decision of the Director of the Division of Taxation, not that of the second hearing examiner. The initial reviewing court's function as we have stated so many times was to ascertain " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the

---

[3]The appellants concede the trial type hearing was held. Their objection is directed to the failure to make adequate factual findings.

opportunity of the one who heard the witnesses to judge of their credibility, * * * and, in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor." *Close v. Kordulak Bros.,* 44 *N. J.* 589, 599 (1965), quoting *State v. Johnson,* 42 *N. J.* 146 at 161 (1964) ; *see also, Mayflower Securities v. Bureau of Securities,* 64 *N. J.* 85, 92–93 (1973).

Dean Stason in a comprehensive review entitled " 'Substantial Evidence' in Administrative Law," 89 *U. Pa. L. Rev.* 1026, 1038 (1941) wrote that:

* * * "substantial evidence" should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside. In effect, this is the prevailing rule in jury trials relative to the direction of verdicts, and is also the prevailing rule applied by *appellate courts* in setting aside jury verdicts because contrary to the evidence.

This has been the test applied by the United States Supreme Court, *Universal Camera Corp. v. N. L. R. B.,* 340 *U. S.* 474, 71 *S. Ct.* 456, 95 *L. Ed.* 456 (1951) and our courts, *N. J. Bell Tel. Co. v. Communications Workers, etc.,* 5 *N. J.* 354, 377–378 (1950).

Initially we must ask ourselves whether the Appellate Division approached its task correctly. If it did "the question is whether *that court* was right or wrong" in sustaining the administrative agency's findings. *State v. Johnson, supra,* 42 *N. J.* at 163. Certainly agreement of the agency and the Appellate Division is a factor to be weighed in favor of the factual conclusions, and we should affirm unless both the agency and the court were clearly in error.

The Director of the Division of Taxation concluded that Inez Duff Bishop died a domiciliary of New Jersey. It followed then that all the real and personal property in this

State and intangible personal property wherever located were subject to the New Jersey Transfer Inheritance Tax. *N. J. S. A.* 54:34–1(a). He reached that result because she had voted on twelve occasions between 1943 and 1964 in New Jersey while residing at the Beach Haven address; she had indicated on each federal income tax return filed throughout the years that her legal residence was in Beach Haven; and she had never filed any Virginia income tax returns.

The Appellate Division properly analyzed the record and ascertained that a reasonable person might have reached the Director's decision on the basis of the substantial competent evidence which supported his findings. While an extended factual description need not be repeated, a brief summary demonstrates the point. Mrs. Bishop and her husband had lived in New Brunswick, New Jersey for 16 years until his death in 1933. They also had a summer home in Beach Haven which she sold on her husband's death. She replaced both homes with a new two-story residence with central heating which she had constructed in Beach Haven. She also established homes in Virginia and Florida. Exactly what part of each year she resided at her New Jersey, Virginia and Florida homes is not clear. There was testimony that she resided annually in Beach Haven from June 1 usually to mid-October. Her voting record discloses that in the November general elections of 1944, 1945, 1948, 1950 and 1956 she voted in person in Beach Haven. She may well have remained in Beach Haven in those years until November. After leaving Beach Haven she would go to Charlottesville, Virginia for a short stay until sometime in December when she would depart for her Florida home where she remained until March. She would then return to Charlottesville for about two and a half months before traveling to Beach Haven. In addition to voting in New Jersey, she filed federal income tax returns in which New Jersey was listed as her legal residence. She never filed Virginia income tax returns or paid Virginia income taxes. She always maintained a bank account

in Beach Haven and supported a local Methodist Church and some local charities.

The presumption arises from the existence of her permanent New Jersey residency that this State remained her domicile until another was acquired and the New Jersey domicile abandoned. *Cromwell v. Neeld*, 15 *N. J. Super*. 296, 300 (App. Div. 1951). Coupled with this presumption, construction of an all year round home in Beach Haven, the continued residence in New Jersey for a substantial period of time each year, the maintenance of a New Jersey bank account, the filing of federal income tax returns in which she designated her Beach Haven home as her legal residence, (see 26 *U. S. C. A.* § 6091), and voting in New Jersey between 1944 and 1964, (*see* Annotation, "Significance of place where one votes or registers to vote on question as to his domicile or residence for other purposes," 107 *A. L. R.* 448 (1937)), constitute substantial evidence to support the Director's factual findings and conclusion that Inez Duff Bishop died a domiciliary of Beach Haven, New Jersey. Note, "Evidentiary Factors in the Determination of Domicil," 61 *Harv. L. Rev.* 1232 (1948). It has been said that "[o]f all the formal acts to be scrutinized in ascertaining a person's domicile, undoubtedly the act of registering and voting is the most important, and, while not necessarily conclusive, it is usually most convincing and persuasive." *In re Curtiss' Will*, 140 *Misc.* 185, 250 *N. Y. S.* 146, 155 (Sur. Ct. 1931). Mrs. Bishop's intent, regardless of whether it was motivated by a desire to escape Virginia income taxes, when coupled with the presumption of domicile, actual residence in New Jersey and the other elements recited above, unequivocally justify the Director's result.[4]

In accepting the second hearing examiner's analysis and findings and rejecting those of the Director, the majority

---

[4]In *Lyon v. Glaser, supra*, 60 *N. J.* at 264, Justice Francis recognized that a person may select a domicile "to avoid taxation."

of this Court concludes that Mrs. Bishop was domiciled in Virginia and therefore was not domiciled in New Jersey. The fallacy in this approach is two-fold. First the question on appeal is whether the evidence supports a finding that she was domiciled in New Jersey and not whether one could also reasonably conclude from the facts that her permanent residence was in Virginia. It is quite possible that both questions may be answered in the affirmative. Mr. Justice Frankfurter recognized this possibility in *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 83 *L. Ed.* 817 (1939):

* * * Two state courts can very legitimately find two different domiciles, in that two equally competent tribunals utilizing the same outward facts in the alembic of the same common law concept of domicile may easily distill contradictory conclusions. [306 *U. S.* at 432, 59 *S. Ct.* at 579; dissenting opinion].

Second, the underlying assumption for the antediluvian concept that one may be domiciled only in one state for inheritance tax purposes has long ceased to exist. Nearly forty years ago Mr. Justice Frankfurter in his dissenting opinion in *Texas v. Florida, supra,* presaged the unsoundness of the single domiciliary principle:

* * * In view of the enormous extent to which intangibles now constitute wealth, and the increasing mobility of men, particularly men of substance, the necessity of a single headquarters for all legal purposes, particularly for purposes of taxation, tends to be a less and less useful fiction. In the setting of modern circumstances, the inflexible doctrine of domicil — one man, one home — is in danger of becoming a social anachronism. Recent applications and modifications of this rule to satisfy the vague contours of the due process clause have hardly mitigated its inadequacies for our day. [306 *U. S.* at 429, 59 *S. Ct.* at 578].

We may take judicial notice of the fact that many people now have two permanent homes, in each of which they spend substantial amounts of time at different periods of the year.[5]

---

[5]The 1970 Census of Housing, Supplementary Report, Characteristics of Second Home Owners for the United States: 1970, Bureau

For purposes of certain rights and duties it may well be that the laws of one state should be exclusive, but the predi-cate cannot and should not necessarily be founded on the rationale of a single domicile, a concept which functioned well in a day gone by.

Modification of the unitary concept has been recognized and advocated. *Worden, et al. v. Mercer Cty. Bd. of Elections,* 61 *N. J.* 325, 343–344 (1972). *See also W. Cook, The Logical and Legal Bases of the Conflict of Laws* 194–210 (1942) ; Reese, "Does Domicil Bear a Single Meaning?", 55 *Colum L. Rev.* 589 (1955) ; Weintraub, "An Inquiry into the Utility of 'Domicile' as a Concept in Conflicts Analysis," 63 *Mich. L. Rev.* 961, 983–986 (1965).

Chief Justice Weintraub aptly observed in *Worden, et al. v. Mercer Cty. Bd. of Elections, supra:*

> The concept of domicil is not constant. It is designed to assure fairness to the individual or the State or both in a given setting. Its ingredients, therefore will vary, depending upon what is just and useful in a given context. [61 *N. J.* at 349; concurring opinion].

The weight of the anachronistic past should not foreclose adoption of a rational concept of domicile particularly appropriate as the basis for imposition of a transfer inheritance tax. Residence in fact and other sufficient additional contacts with the taxing state render imposition of the tax fair and proper where the decedent has received the benefit and protection extended by that state. *See Tax Commission of Utah v. Aldrich,* 316 *U. S.* 174, 178–179, 62 *S. Ct.* 1008, 1010–1011, 86 *L. Ed.* 1358, 1369 (1942) ; *Curry v. McCanless,*

---

of the Census, U. S. Dept. of Commerce advises that of the nation's 63.4 million households in 1970, 2.9 million or 5% owned a second home. Ownership of a second home was directly related to income and of those in the group whose income was $50,000 or more nearly 20% owned a second home. *M. Clawson, Suburban Land Conversion in the United States* (1972) notes that there is a tendency for second homes to become permanent residences.

307 *U. S.* 357, 366–368, 59 *S. Ct.* 900, 905–907, 83 *L. Ed.* 1339, 1347–1348 (1939). The appropriate question which should be asked and answered is whether Inez Duff Bishop had a sufficient relationship with New Jersey so that it is reasonable to charge her estate with an inheritance tax on its intangible property. Such a domiciliary concept eliminates the anomalous consequences resulting from application of the traditional concept in the inheritance tax field. *See* Reese, *supra* at 592–593. A finding that an individual was "domiciled" in two states for inheritance tax purposes is recognizable and realistic if that individual enjoyed during his lifetime a sufficient degree of benefit and protection extended by each sovereign. *See* Farage, "Multiple Domicils and Multiple Inheritance Taxes — A Possible Solution," 9 *Geo. Wash. L. Rev.* 375, 377–380 (1941) ; *W. Cook, supra* at 195–210 (1942). This is particularly true where the choice to establish residences in more than one state has been made by the decedent. No charge of surprise can be raised for it has long been recognized that there may be "conflicting" judicial decisions concerning domicile, each of which will be binding. *Riley v. New York Trust Co.,* 315 *U. S.* 343, 349–350, 62 *S. Ct.* 608, 86 *L. Ed.* 885 (1942). No constitutional infirmity blocks the path of this doctrine. *Worcester County Trust Co. v. Riley,* 302 *U. S.* 292, 299, 58 *S. Ct.* 185, 82 *L. Ed.* 268 (1937) ; *In re Dorrance's Estate,* 309 *Pa.* 151, 163 *A.* 303 (1932), *cert.* den. 287 *U. S.* 660, 53 *S. Ct.* 222, 77 *L. Ed.* 570 (1932) ; *In re Dorrance,* 115 *N. J. Eq.* 268 (Prerog. Ct. 1934), aff'd 13 *N. J. Misc.* 168 (Sup. Ct. 1935), aff'd 116 *N. J. L.* 362 (E. & A.), *cert.* den. 298 *U. S.* 678, 56 *S. Ct.* 949, 80 *L. Ed.* 1399 (1936). As a matter of fundamental fairness the outmoded principle that no person has more than one domicile which precludes inheritance tax applications of more than one state should be discarded.[6]

---

[6]At her death the value of Mrs. Bishop's estate was approximately $1,800,000. The Virginia and New Jersey inheritance taxes in

The Executors' claims that the Virginia judgment that the decedent was domiciled in that state is entitled to full faith and credit under Article 4, Section 1 of the U. S. Constitution, and that imposition of the New Jersey tax would constitute double taxation in contravention of the due process clause of the Fourteenth Amendment of that Constitution, have no merit. *See In re Dorrance, supra; Worcester County Trust Co. v. Riley, supra.* Substantial reliance for the Executors' position is placed upon *Western Union Telegraph Co. v. Pennsylvania,* 368 *U. S.* 71, 82 *S. Ct.* 199, 7 *L. Ed.* 2d 139 (1961) in which the Supreme Court upheld Western Union's objection to Pennsylvania escheating unclaimed money orders. But the short answer to that "analogy" is that it involved the diverse claims of many jurisdictions to the whole of a precise obligation. The distinction is obvious. Here, we are concerned with a tax on intangible personal property. In this respect in *Texas v. Florida, supra,* the Court stated:

* * * That two or more states may each constitutionally assess death taxes on a decedent's intangibles upon a judicial determination that the decedent was domiciled within it in proceedings binding upon the representatives of the estate, but to which the other states are not parties, is an established principle of our federal jurisprudence. [306 *U. S.* at 410, 59 *S. Ct.* at 569].

No sound principle warrants our extending the *Western Union* doctrine applicable to escheats to possible multistate inheritance taxation.

The unfair and illogical consequences that can result from application of the traditional but ill-suited and now outmoded single domicile concept to inheritance taxation is

the aggregate totaled about $125,000. Under *N. J. S. A.* 54:38A–1, the Director of the Division of Taxation is authorized to enter into an agreement with the taxing authorities of another jurisdiction and the executor in which the taxes due each state is settled. This mechanism is available to avoid an inequitable result where an estate may be unduly burdened by the claims of several states. That situation does not exist here.

demonstrated by the result reached today. The effect is to permit the estate of the decedent, who during her lifetime avoided Virginia state income taxes by claiming and enjoying the benefits of a New Jersey domicile, to now escape payment of New Jersey's higher inheritance tax rate by claiming a Virginia domicile.[7] Such a result unjustly enriches the estate and deprives this State of its lawful revenues.

In passing it should be noted that a shifting of the burden of proof to the estate under the circumstances of this case is warranted. The facts are in the possession of the estate and the witnesses are interested persons. Justice Jacobs advocated a shifting of the burden in *Lyon v. Glaser, supra,* and commented:

> So here, the shifting of the burden of establishing a transfer of long-standing New Jersey domicil may serve towards containing some of the evasions which impose so unfairly on other New Jersey domiciliaries. [60 *N. J.* at 281].

Both from the standpoint of substance and policy the onus should be placed on the estate to establish by a fair preponderance of the evidence that Mrs. Bishop had abandoned her New Jersey home. It is true of course that in light of the Director's findings, supported as they are by substantial credible evidence, the result would be the same whether or not the burden is shifted. Reference is made to this principle because it is appropriate in a case of this type.

At the outset of this opinion, reference was made to the factual analysis and findings of the second hearing examiner which are adopted by the majority and are themselves subject to infirmities. Over objection, the examiner had admitted into evidence 14 affidavits, all of which constituted hearsay. He relied upon some of these affidavits. He also placed great weight on the testimony of Richard G. Hantz-

---

[7]The New Jersey inheritance tax was $89,000 and the Virginia tax $36,000.

man, an accountant, who never met or spoke with Mrs. Bishop. He accepted the most favorable inferences from the standpoint of the estate, although its witnesses were beneficiaries or employees of or persons engaged by the co-executor, Citizens Bank and Trust Company. Suffice it to say the Appellate Division's review and analysis of the record and its approach to the problem before it were eminently correct.

I would affirm.

Justice PASHMAN joins in dissent.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN and CLIFFORD and Judge CONFORD—5.

*For affirmance*—Justices PASHMAN and SCHREIBER—2.